George G. PAPPAS and James C. Jangarathis, Arthur Einhorn and Elizabeth I. Einhorn, Mark Kirshenbaum, The Niagara Wire Weaving Company, Limited, Perunt Co., Edmund Pescia and Emma Pescia, Herman Rubinstein, William Sachs, H. Terry Snowday, Jack Tager, on behalf of themselves and all other stockholders of Hydromatics, Inc., similarly situated, Plaintiffs,

v.

Bernard L. MOSS, Harrison J. Britton, Leo N. Sokol, Philip B. Brooks, Philip B. Brooks, as Trustee of Hydromatics Employees Profit Sharing and Retirement Trust, Edward Nathan, and Hydromatics, Inc., Defendants.

Civ. A. No. 96–62.

United States District Court
D. New Jersey.

May 6, 1966.

As Amended Aug. 15, 1966.

Bourne, Schmid, Burke & Noll, Summit, N. J., for plaintiffs, by Edward T. Kenyon, Summit, N. J., Burke & Burke, New York City, of counsel, by George I. Harris, New York City.

Clapp & Eisenberg, Newark, N. J., for individual defendants, by Jerome C. Eisenberg, Newark, N. J.

McGlynn, Stein & McGlynn, Newark, N. J., for defendant, Hydromatics, Inc., by Roger H. McGlynn, Newark, N. J., Edward Nathan, Gen. Counsel, New York City.

WORTENDYKE, District Judge:

This action was initially instituted by certain minority stockholders against a New Jersey corporation (Hydromatics), and three of its five officers and directors. Defendants Edward Nathan, and Philip Brooks as Trustee of the Employees' Profit Sharing and Retirement Trust, were joined in the amended and supplemental complaint. When the action was commenced jurisdiction was predicated upon diversity of citizenship; but subsequent proceedings therein destroyed the diversity but invoked jurisdiction under a federal statute. Jurisdiction of the original single count of the complaint has, despite the destruction of diversity, been retained as pendent to the federal statute jurisdiction. The present defendants are the corporate officers and all of the directors. There remains presently as sole plaintiff a Canadian corporation holding 1,700 shares of $1.00 par common stock of the corporation, out of a total of 352,534 shares issued and outstanding.

The plaintiff sues derivatively in the right of the corporation, and charges the defendant directors with breach of their common law obligation to the corporation and with violation of S.E.C. Rule X–10B–5 adopted pursuant to § 10(b) of the Securities Exchange Act of 1934 as amended. Recovery is also sought of short swing profits, under § 16(b) of the Act from defendants Sokol, Moss and Britton.

The causes of action alleged are predicated upon the unanimous action of the corporation's board of directors in adopt-

ing a resolution on December 21, 1961 authorizing the issuance of 64,534 shares of the authorized but theretofore unissued and unregistered shares of the common stock, at a price of $6.00 per share, to themselves and other purchasers under agreements to hold the shares for investment purposes only, but providing that the corporation would cause the shares to be registered within eighteen months following the date of issue.

At the time of the adoption of the resolution there were issued and outstanding 318,000 shares which had been registered and were traded on the American Stock Exchange since 1960. The original issue of Hydromatics' stock to the public was at a price of $10.00 per share.

During the period from January 1, 1961 to January 16, 1962, the price of the stock of the corporation being traded on the Exchange ranged between a low of $10\frac{3}{8}$ and a high of $24\frac{7}{8}$.

The corporation was engaged in the business of manufacturing ball valves. Its principal market had been in the military field but during the year 1960 the corporation developed a new line of ball valves for the civilian market, for the entry into which management had estimated that additional capital of $2,000,000 would be required.

During the fiscal year ended August 31, 1961 the corporation had moved its plant to new leased quarters, in connection with which it underwent some extraordinary expense. Its net sales dropped from $3,621,160 in 1960 to $2,373,361 in 1961. During the 1960–1961 fiscal year, the corporation suffered a loss of approximately $215,000; it had outstanding debts consisting of a long-term unsecured bank loan of $500,000 and two 90-day renewable notes in the amount of $350,000. Pertinent provisions of the larger of these items of indebtedness are set out in footnote 3. The terms of this loan agreement further provided that in the event of the breach of any of the foregoing conditions, the lending bank might put the corporation on written notice of the default and if the default persisted for thirty days

thereafter, the loan would become callable. For the fiscal year ended August 31, 1961 the corporation's pre-tax loss was $442,000 which, however, included $117,000 in engineering development costs charged against fiscal 1960–61 operations. Despite a small profit for the first quarter of fiscal 1961–62 ($16,612 after taxes), the corporation was in need of additional capital and was threatened not only with the calling or requirement of full collateralization of its long-term loan indebtedness, but had been refused delivery by an unpaid supplier, preventing the making of deliveries to a principal customer.

The resolution unanimously adopted by the directors of Hydromatics at the meeting of the board held on December 21, 1961, authorized the corporation to enter into agreements to sell a total of 100,000 common unregistered shares of stock of the company to a limited number of private investors, not in excess of 15, including some small investment companies, the stock to be acquired for investment and not for resale, and to be offered at a price per share of $4.00 below the market price (then approximately $10.00 per share), or at a price of $6.00 per share. The resolution also directed that management agree to purchase similar stock of the company at the same price, to meet the conditions imposed by the prospective private investors, in an aggregate of approximately $152,000, and that in further compliance with the requirements of the private investors the corporation agree that "on or before the expiration of eighteen months from the date of the agreement with [them] * * * the company prepare and file, at its own cost, such proceedings as may be necessary to cause any shares so issued for investment to be registered pursuant to the Federal Securities Exchange Act of 1933 as amended, [sic] to the end that said shares * * * shall be qualified for public sale and distribution." The meeting was informed that one of the directors had discussed the proposed transaction with a prospective private investor who had agreed to purchase $50,000 of

investment stock at $6.00 a share "upon the condition that the directors, including the president, would likewise purchase [such] investment stock, and that this investor had about three friends in New York who would also invest on a similar basis." A list of the private investors contemplated by the resolution was made up and attached to the minutes of the meeting after they had been written up at a subsequent date. Between December 21, 1961 and January 2, 1962, negotiations were had in behalf of the corporation, through certain of its officers, with various prospective private investors, and written sales agreements, and investment letters between the corporation and the respective private investors were drafted and executed. By the terms of these documents the corporation sold to the investor and the investor purchased from the corporation a specified number of shares of unregistered common stock of the corporation for a price of $6.00 per share; the investor agreed that he would hold these shares for investment and not assign or distribute the same, and the corporation agreed to cause the shares to be registered with the S.E.C. within a period of eighteen months from December 21, 1961; failing which the corporation would pay to the investor a penalty of ½ of 1% per share per month during such portion of the next succeeding eighteen months period as the shares remained unregistered.

A regular meeting of the stockholders of the corporation was noticed for and held on February 8, 1962. The notice of and proxy for that meeting advised the stockholders that the board of directors would seek stockholder approval of the action of the board in authorizing and consummating the sale of the $6.00 shares.[1] The notice also stated that the officers and directors would vote all of their shares, including the $6.00 shares which they had purchased from the corporation, in favor of ratification of the directors' action. The minutes of the

meeting indicate that this purported ratification was made by a majority of 251,864 out of the 268,585 stockholders voting.

This action was instituted after the resolution of the board of directors, but prior to the stockholders' meeting and an application for a preliminary injunction to prevent the holding of the stockholders' meeting was denied by this Court's order of February 8, 1962.

Plaintiffs stated their claims at pretrial conference as follows:

(1) Defendants caused the corporation to issue the $6. shares at less than true value, thus defrauding the corporation.

(2) Defendants falsely represented to the corporation that the private investors required that the directors participate in the purchase of the $6. shares; and that the price of $6. per share was prescribed by the private investors.

(3) Defendants falsely represented to the corporation that when the agreements for the purchase of $6. shares were entered into, the average price of Hydromatics stock traded on the American Stock Exchange was approximately $10.50 per share.

(4) Defendants falsely represented to the corporation that they were acquiring the $6. shares for investment and not for public sale, although they knew at the time that some of them were selling previously acquired registered shares on the stock exchange.

(5) Short-swing profits were made on stock of the corporation by insiders which are recoverable by the corporation under 15 U.S.C. § 78p(b).

The contentions of the defendants may be summarized as follows:

(1) Plaintiffs ratified and approved the transactions complained of and

---

1. The resolution of the board of directors did not require ratification by the stockholders; nor did the certificate of incorporation of the company provide for stockholder ratification of the action of the board of directors.

thereby waived their right to criticize them.

(2) The Board of Directors had authority to accomplish the criticized transactions and acted in good faith in doing so.

(3) The certificate of incorporation validates the transactions.

(4) The officers and directors were required to participate in the purchase of the $6. shares by the private investors as a condition precedent to participation by the latter therein.

(5) The $6. shares were issued under agreements of the purchasers to hold them for investment and not for resale.

(6) This Court was ousted of diversity jurisdiction by the addition of a party defendant of nondiverse citizenship.

(7) The price of $6. per share at which the registered stock was sold was fair and equitable.

(8) S.E.C. Rule 10(b) (5) is not available to the plaintiffs because they were neither buyers nor sellers of the securities.

(9) Section 16(b) of the Securities and Exchange Act of 1934 imposes no liability upon defendants Sokol, Britton or Moss because none of them made a profit through the purchase or sale of Hydromatics stock held by him for a period of less than six months.

The aggregate of 64,534 shares of the $6. stock which were issued, some on December 28, 1961 and others on January 2, 1962, were distributed as follows:

| | |
|---|---|
| Saul Ludwig | 8,500 shares |
| Harry Moses | 4,000 shares |
| Robert Berkowitz | 3,300 shares |
| Samuel Dorsky | 4,200 shares |
| Seymour Lichtenstein | 4,200 shares |
| State Street Capital Corp. | 7,000 shares |
| United Guaranty Corp. | 3,000 shares |
| Philip B. Brooks, Trustee of Hydromatics Employees Profit Sharing and Retirement Trust | 5,000 shares |
| Bernard L. Moss | 8,500 shares |
| Harrison J. Britton | 4,167 shares |
| Leo N. Sokol and Francine Sokol | 1,667 shares |
| Edward Nathan | 2,500 shares |
| Philip B. Brooks | 8,500 shares |
| | 64,534 shares |

Before and after the criticized transactions, the defendants Moss, Britton, Sokol and Brooks controlled the management and board of directors of the corporation through their ownership, in the aggregate, of a majority of the issued and outstanding shares of its stock and their positions as officers and directors of the corporation.[2] Besides being a director of the corporation, Brooks was also trustee of its Employees' Profit Sharing and Retirement Trust.

The proxy statement accompanying the notice of the annual meeting of stockholders held on February 8, 1962, at which

2. Prior to the issuance of the $6. shares, the stockholdings of the officers and directors were on December 18, 1961:

| | |
|---|---|
| Moss | 126,175 shares |
| Britton | 43,400 shares |
| Sokol | 381 shares |
| Nathan | 201 shares |
| Brooks | 800 shares |
| | 170,957 shares |
| Brooks as Trustee of the Profit Sharing and Retirement Trust then owned | 1,100 shares |
| | 172,057 shares |

There were 288,000 shares of $1. par value issued and outstanding when the $6. shares were issued and an additional 30,000 shares had been reserved for issue in accordance with the provisions of an employees' stock option plan. The registered stock listed for trading on the American Stock Exchange had been selling, between December 28, 1961 and January 2, 1962, at a high of 15¾ and a low of 13. On January 17, 1962 the Exchange suspended all trading in Hydromatics stock. The suspension was removed February 15, 1962.

the issuance of the $6. shares was purportedly ratified, represented that, during the corporation's fiscal year which ended August 31, 1961, it had suffered a loss of approximately $215,000; that the company had outstanding debts, consisting of a long-term unsecured bank loan of $500,000, and a short-term line of credit in the amount of $350,000, and that, during the 1961 fiscal year, management had unsuccessfully explored several possible sources of additional capital. It was also therein stated that in September 1961 there had been unsuccessful negotiations with an investment banking firm for the private placement of a convertible debenture; but that it had become apparent to management that sufficient additional capital could not be raised through the usual investment banking channels. The stockholders were advised that the corporation was informed by its largest creditor, Empire Trust Company, on December 14, 1961, that the debtor would be required to obtain equity capital in an amount of at least $400,000 by December 29, 1961; failing which the bank would take steps to place its loan upon a fully secured basis, or would require payment thereof. It was indicated that the corporation's working capital had become less than it was required to maintain by the conditions of the loan.[3]

Six critical fact issues emerge from the evidence: (1) On what date were the criticized transactions consummated? (2) Did the private investors fix the price of $6. a share as a condition of their purchase of the stock? (3) Did these private investors impose, as a further condition for their participation in the $6. share purchase, the requirement that the officers and directors of the company, as evidence of their good faith, make investments in the stock substantially matching those of the investors? (4) Was the price at which the $6. shares were sold so low as to defraud the corporation? (5) Was the proxy statement, annexed to the notice of stockholders' meeting, false or misleading? (6) Did certain officers and directors of Hydromatics make short swing profits in its stock?

## JURISDICTION

■ Defendants have questioned the effect of joinder in the amended and supplemental complaint of the defendant Edward Nathan, who was of common citizenship (New York) with plaintiffs, upon the diversity subject-matter jurisdiction of the Court (28 U.S.C. § 1332) which existed when the action was commenced. The jurisdictional issue is always critical at any stage of the litigation. McNutt v. General Motors Acceptance Corp., 1936, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135. The supplemental and amended complaint (filed February 13, 1963) retained the single "common law count" of the original complaint, and added thereto four other counts purporting to be based on the Securities Exchange Act of 1934; thereby seeking to confer federal question jurisdiction, 15 U.S.C. § 78aa. Plaintiffs contend that the retention of the original single cause of action in the supplemental and amended complaint invested the Court with jurisdiction thereof pendent to that afforded by the federal question jurisdiction invoked by the added counts. Defendants, however, assert that the federal question allegations are sham and insubstantial, and therefore inadequate to create or support pendent jurisdiction over the first count.

■ The sufficiency of jurisdiction must be determined as of the time when the action was commenced. McNello v. John B. Kelly, Inc., 3 Cir. 1960, 283 F.2d 96; Corabi v. Auto Racing, Inc., 3 Cir. 1959, 264 F.2d 784, 75 A.L.R.2d 711; Smith v. Sperling, 1957, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205. There was diversity jurisdiction at that time. The

---

3. The terms of the Empire Trust $500,000 note forbade Hydromatics to incur any obligations in excess of $250,000, and required that the ratio between debtor's consolidated current assets and consolidated current liabilities be maintained at not less than 1.75 to 1.

amended and supplemental complaint invoked federal question jurisdiction of causes of action ancillary to the reiterated original cause of action.

"Generally, in a diversity action, if jurisdictional prerequisites are satisfied when the suit is begun, subsequent events will not work an ouster of jurisdiction. [Citing cases]. This result is not attributable to any specific statute or to any language in the statutes which confer jurisdiction. It stems rather from the general notion that the sufficiency of jurisdiction should be determined once and for all at the threshold, and if found to be present then should continue until final disposition of the action." Dery v. Wyer, 2 Cir. 1959, 265 F.2d 804, 808.

I recognize jurisdiction of the amended and supplemental complaint. Having assumed jurisdiction over such of the causes of action of the amended and supplemental complaint as have survived the pretrial conference, the Court may proceed to determine whether they state claims upon which relief may be had, and, if so, whether they find support in the evidence. See Bell v. Hood, 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939; Ruckle v. Roto American Corporation, 2 Cir. 1964, 339 F.2d 24.

" . . . [A]n actual right . . .
"An actual right to relief under some federal statute need not be established to justify adjudication of the merits of a coupled common-law claim. * * * The common-law claim must be dismissed only if the coupled federal contention is 'plainly insubstantial either because obviously without merit, or 'because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.'" Taussig v. Wellington Fund, Inc., 3 Cir. 1963, 313 F.2d 472, 475 and cases therein cited.

## THE $6. SHARES

The Certificate of Incorporation of Hydromatics provided, *inter alia,* that

"[n]o contract or other transaction between this corporation and any other corporation, and no act of this corporation, shall in any way be affected or invalidated by the fact that any of the directors of this corporation are pecuniarily or otherwise interested in or are directors or officers of such other corporations, and any director individually, or any firm of which any director may be a member, may be a party to, or may be pecuniarily or otherwise interested in, any contract or transaction of this corporation; provided that the fact that he or such firm is so interested shall be disclosed or shall have been known to the Board or a majority thereof; and such director may be counted in determining the existence of a quorum at any meeting of the Board of this corporation which shall authorize any such contract or transaction, notwithstanding the fact that such director is so interested."

The 318,000 publicly held shares were listed for trading on the American Stock Exchange (New York) on November 3, 1960. Their price range on the Exchange during the period January 1, 1961 to January 16, 1962 appears in the following table:

| | High | Low |
|---|---|---|
| First Quarter | 22⅞ | 18⅛ |
| Second Quarter | 24⅞ | 17½ |
| Third Quarter | 18⅞ | 13 |
| Fourth Quarter | 14½ | 10⅜ |
| January 1–16, 1962 | 15⅞ | 13 |

An average high of 19.4 and low of 14.4. As of January 23, 1962, in consequence of their purchase of the $6. shares, the following defendant officers and directors of Hydromatics had become beneficial owners of the indicated numbers of shares of its common stock:

| Bernard L. Moss | President and Director | 133,995 shares |
| Harrison J. Britton | Vice President and Secretary | 47,567 shares |
| Leo N. Sokol | Comptroller and Director | 1,848 shares |
| Philip B. Brooks | Director | 9,300 shares |
| Edward Nathan | Assistant Secretary and Director | 2,701 shares |
| Philip B. Brooks | As Trustee of Hydromatics Employees' Profit Sharing and Retirement Trust | 5,000 shares |

The corporation had initially concentrated upon the production of ball valves[4] for the military market; and by 1959 it had become the principal supplier of such valves for missiles, rockets, ground support, aircraft and submarine uses. In 1960 it developed a new line of ball valves for the civilian market. Management had estimated that it would require $2,000,000 in additional capital to enable the company to enter the new market. Accordingly, Arthur D. Little, Inc., a management consulting firm, was employed to investigate the company's actual and potential sales fields, and to project its prospects through the next five years. The Little Report, dated May 9, 1961, predicted a decline in sales during fiscal 1961, with the total dropping from $3,600,000 in 1960 to slightly less than $2,500,000 in 1961. That projection was substantially verified by actual audit of net sales in fiscal 1961, which amounted to $2,373,361. The same Report, as well as management's own estimates, predicted that the decline in military sales would end in 1961, and that thereafter the corporation would retain from 35% to 45% of the military market which it then enjoyed. Gradual increases in military sales after 1961 were projected, together with a sharp increase of sales for civilian use. The total sales estimated for fiscal 1962 was $3,600,000, and that for fiscal 1963, $5,000,000.

In 1960, in contemplation of entry into the civilian market, the company rented and took possession of a new manufacturing plant in Bloomfield, New Jersey. Prior to moving to the new location, management estimated the cost of moving and plant adaptation at $2,000,000. The corporation, however, began to lose progressively in its pursuit of civilian business, and fiscal 1961 was expected and proved to be a poor year. The year-end statement showed a pre-tax loss of $442,000, and a probable post-income tax loss of $215,000. This loss picture was found to reflect the following factors, namely, decline in military orders, interruption of production while moving plant to new location, cost of improvements in the new plant, expenses for engineering development, and the building of inventory for expected increased sales. The reduction in military orders had been foreseen by the officers and directors in 1960, prior to moving the plant to Bloomfield; and the earnings decline had been anticipated with accuracy prior to the release of the Little Report on May

4. A ball valve is a sphere mounted and rotated on an axis in a sealed chamber with a cylindered aperture drilled through the sphere at an angle of 90 degrees to the axis of rotation. When the sphere is aligned with an in-line flow of material through a tubular conductor, such flow becomes infinitely variable by means of a 90 degree rotation of the sphere.

9, 1961. It was hoped that such decline would be arrested in fiscal 1962. The actual fiscal 1961 pre-tax loss would have been approximately $325,000, rather than $442,000, if $117,000 in engineering development costs had not been written off against 1961 operations to avoid burdening future years with those expenses.

Management expected that fiscal 1962 would show a "turnaround" in the company's financial retrogression of 1961, and had supplied profit projections for fiscal years 1962–1965 to Granberry Marache & Co., investment bankers, in connection with an application to that firm for financing in the summer of 1961. Hydromatics projected its fiscal 1962 post-income tax profit at $100,000, without including the amount of its income tax claims filed in 1961, upon which refunds were expected during 1962. As early as September, 1961 the officers and directors expected that the first quarter of fiscal 1962 (September 1–November 30, 1961) would show a slight profit. Sales for that quarter were $938,458, providing income after taxes of $16,612. In the comparable period of fiscal 1961, sales had been $614,688, resulting in a net loss of $72,534 after taxes. The foregoing comparison was considered by management to reflect a probable continuing sales and earnings increase. The backlog of orders at the end of the first quarter of 1962 was nearly $2,000,000 compared to less than $1,000,000 at the end of the first quarter of fiscal 1961. Hydromatics' management was aware, prior to December 21, 1961, of the change disclosed by its quarterly figures for the period ending November 30, 1961. No program to raise the sum of $2,000,000 in capital estimated as requisite to enable the company to expand into the civilian ball valve market was ever developed. Moreover, the company's expected inventory increase upon entering that market was reflected in a rise from $559,000 at the close of fiscal 1960, to $1,344,000 by November 30, 1961.

On May 24, 1961 Hydromatics borrowed $500,000 from Empire Trust Company, a New York bank, on a long term note. This same note has been referred to heretofore. No part of this loan was repayable prior to August 31, 1962. The note which evidenced the loan provided that, in the event of a breach of the conditions stated in footnote 3, the bank could put Hydromatics on written notice of the default, and if the default then continued for 30 days thereafter, the loan would become callable. No such notice of default was ever given by the bank to Hydromatics, and the note continued to remain entirely unsecured. On May 24, 1961, Hydromatics borrowed an additional $350,000 from the same bank upon two short-term 90-day notes.

The lending bank received from Hydromatics, at the beginning of November, 1961, its profit and loss statement for fiscal 1961, and its balance sheet as of August 31, 1961. The long term note had not then been declared in default. However the bank's analysis of the August 31 balance sheet disclosed that there were included among the debtor's consolidated current assets items which the bank considered improper. Accordingly, on November 24, 1961, the bank informed Hydromatics' management that it desired that the long-term note be secured by appropriate collateral. Hydromatics did nothing to assure the bank that the loan would be secured; but its President (Moss) advised the bank that he desired to raise equity capital as an alternative to posting security for the long-term note. On December 7, 1961, he informed the bank that he would raise such equity capital by the sale of Hydromatics stock. On December 14, 1961, Mansfield, the Bank's Vice-President, advised Hydromatics by letter that the bank desired to have its loan secured in the event Hydromatics was unable to raise the equity capital which its President had previously stated he would undertake to obtain. At this time Hydromatics was being pressed for payment by Lebanon Steel Foundry, a major supplier, which had stopped deliveries of material to Hydromatics, and had notified Newport News Shipyard, a principal customer of Hydromatics, that it would not resume deliv-

eries until its account with Hydromatics had become current. In October and November, 1961, Hydromatics had given Lebanon two 90-day notes for sums aggregating over $100,000 of past due accounts. $75,000 was paid to Lebanon on account of this indebtedness out of the proceeds of sale of the $6. shares.

The Directors had held a special meeting on December 14, 1961, at which the president reported on discussions he had had with Frank Visceglia representing the owner of the fee of the company's new plant location. The minutes of that meeting report that a deal had been tentatively negotiated in which Mr. Visceglia's company had offered to buy a substantial number of shares of Hydromatics at $6.00 a share, payable $60,000 in cash, $60,000 in the form of a credit against prepaid rent, and $20,000 in cash upon a claim for repair to the concrete floor of the plant building. It was also understood that an adjustment of a claim for real estate taxes and the company's participation in an increase in taxes under the lease would be effected. The stock purchase was to be for investment, with the understanding that the stock would be registered under the Securities and Exchange Act of 1933 [sic] within 18 months from the date of the consummation of the deal. An option to compel the company to repurchase the stock at $10 was also discussed, and Mr. Moss explained that the price offered seemed to be in line with the company's experience in connection with its attempted private placement of notes or debentures which up to this point had been unsuccessful. Visceglia allegedly rejected the suggested purchase of Hydromatics' stock, but offered to lend the corporation $120,000 upon terms which included its issue of 17,144 warrants to purchase its stock at $6. per share. The Board directed the officers to draft a form of contract, but reminded them that other sources of obtaining funds should be expeditiously explored. The defendant directors were aware that an increase of current liabilities in relation to the decrease of current assets would amount to a violation of the working capital provisions of the note held by the Empire Trust Company.

Of the $6. shares which were purchased by the officers and directors of Hydromatics, 33,834 shares were issued by its registrar and transfer agent on December 28, 1961. On January 2, 1962, the remainder of the $6. shares, aggregating 30,700, were issued in different respective amounts, to Brooks, as Trustee of Hydromatics Profit Sharing Trust, and to the so-called private investors, Ludwig, Moses, Berkowitz, State Street Capital Corp., United Guaranty Corp., Dorsky and Lichtenstein. At $6. a share, the total return to the corporation was $387,204 for the 64,534 shares.

Each of the purchasers of the $6. shares executed a written stock purchase agreement and an investment letter. These documents were prepared by counsel for the corporation, and, as printed, bore the date of December 21, 1961. Each of these documents, however, was signed on a date subsequent to that which it bore. The purchase agreement in each case stated that Hydromatics sell to the purchaser a certain number of shares of Hydromatics' stock at the stated price of $6.00 per share. Hydromatics acknowledges receipt of the purchase price, and the purchaser acknowledges the simultaneous delivery of certificates for the shares. The agreement recited that the purchaser was requiring, as a condition of the sale, that the directors of the corporation collectively purchase 25,334 shares of the $6. stock. The agreement also provided that the corporation undertook to institute and prosecute proceedings necessary to register or qualify the $6. shares for public sale and distribution within 18 months, and to bear the cost of such registration or qualification. For its failure to register the stock before the expiration of the initial period of 18 months, an interest penalty would be imposed upon the corporation of ½ of 1% per month of the market value of the stock sold during the following 18 month period.

The so called investment letter, also prepared by counsel for the corporation, and dated December 21, 1961, was signed by each of the purchasers of the $6. shares. The letter recites that the shares were acquired in a private transaction; that the purchaser had been supplied with current material concerning the business of the corporation, and its financial statement dated August 31, 1961 for the last fiscal year, and had discussed the company's affairs with officers, directors and financial advisers who were familiar therewith. The letter further represented that the purchaser was an active investor in securities of the type being acquired, was conversant with the problems of making an investment of the kind contemplated under the circumstances involved, and that such investment was not unusual for the purchaser in the light of the nature and size of his portfolio. Each purchaser therein further represented that he was acquiring the $6. stock for investment, and with no present intention of selling or distributing the same, or any part thereof, publicly. The purchaser agreed that in no event would any future disposition by him of all or any part of the stock be made in violation of the Securities Act of 1933 as amended. The letter also stated that, in making the aforesaid representation, the purchaser did not have in mind disposing of the stock after any specified period of time, such as the holding period for capital gains federal tax treatment, or at any point when the stock may have reached a specific price level, but that he had purchased the stock for investment, and with the idea and intention of holding it indefinitely for income, and ultimate appreciation resulting from the company's growth. The purchaser also represented that he knew of no personal circumstances which would make it necessary for him to sell the shares in the then foreseeable future, and that, by reason of his familiarity with the company's affairs, he was then aware of no circumstances relating thereto which would necessitate his sale of the stock in the foreseeable future. He agreed that he would not transfer the securities without advising the company of the circumstances requiring such transfer.

Early in December, 1961 Director Brooks disclosed to his friend, Ludwig, the corporation's contemplated sale of unregistered shares of its stock at $6.00 a share. Ludwig expressed interest in investing therein. Ludwig met with Moss, the president of the corporation, at its plant and was informed that, although the company had had a loss for fiscal 1961, the first quarter of fiscal 1962 showed a profit of some $16,000. Ludwig had another meeting with Moss in January, 1962; but at neither of these meetings was there any disclosure that any officer of the corporation would be required to invest in the $6. stock.

The form of the stock-purchase agreement between the corporation and the private investors was negotiated between Nathan for the corporation and Ludwig for the investors. An initial draft of the agreement, dated December 27, 1961, prepared by Nathan, contained no penalty provision for failure of Hydromatics to qualify the $6. stock for subsequent public sale or distribution within 18 months. The draft was accordingly modified to include that provision. Ludwig, however, requested that the agreement contain an undertaking by Hydromatics to repurchase the stock in the event of its failure to register it within 18 months, and Ludwig's attorney negotiated with Nathan respecting the inclusion of such a provision. That discussion was both by telephone and in person at Nathan's office in New York City on December 27, 1961. Nathan would not agree to that provision, but counter-suggested a penalty provision of interest at the rate of ½ of 1% per month commencing with the second eighteen-month period. This proved ultimately satisfactory to the negotiators, and the draft of agreement was thereupon printed. As printed, the document was not available for execution until some time after December 27, 1961, although it bore the date of December 21 (the date of the directors' meeting which had authorized the sale of the stock). The shares purchased by Ludwig were not

issued until December 28, and he paid for them on December 29. Throughout his negotiations with Nathan there was no suggestion by Ludwig that the officers and directors of the corporation would be required to purchase any of the $6. shares as a condition of the purchase thereof by the private investors.

After he had executed his agreement to purchase the $6. shares, Ludwig disclosed the fact of his purchase to his friends, Moses and Dorsky, who thereupon inquired of Brooks whether any more of the $6. shares were available. Upon learning that more of such shares were to be had, Moses and Dorsky arranged their own appointments for inspection of the Hydromatics' plant. Moses paid for his stock on January 2, 1962, and a certificate therefor was delivered to him on January 3. Dorsky negotiated his purchase of the stock through an attorney who, as late as January 2, 1962, sought from Nathan certain warranties and assurance that Hydromatics was not in default on its note to the Empire Trust Company. Dorsky and his attorney were referred by Nathan to Mansfield, a Vice President of Empire Trust Company, but Nathan would not agree to any of the warranties which the attorney suggested. On January 2, 1962, Dorsky delivered his check to Hydromatics for $50,400 covering his purchase of 4,200 shares and an additional 4,200 shares purchased by his co-investor, Lichtenstein. Certificates for these shares were delivered to the respective purchasers on January 3, 1962. Neither Ludwig nor any representative of Hydromatics discussed Lichtenstein's investment in the $6. shares, but his participation was pursuant to his agreement with Dorsky.

During the negotiations of Brooks and Moss with Ludwig, Moss was also negotiating with Berkowitz. Both before and after Christmas, 1961, Berkowitz visited the plant of the corporation to discuss his contemplated investment in its stock; but he never expressed any desire that the officers and directors purchase any of the stock. Berkowitz executed his stock purchase agreement and

signed his investment letter on or about January 1, 1962. He paid the corporation for his 3,300 shares on January 2, and a certificate for his stock was delivered to him on January 3.

During the first week in December, 1961, and again two weeks later, Moss discussed with Perri, president of American Guaranty Corporation and Treasurer of United Guaranty Corporation the matter of investing in the $6. stock. Perri indicated to Moss that United Guaranty Corporation and State Street Capital Corporation, two small business investment corporations, and possibly another, unnamed, were interested in investing in the stock. A letter of December 20, 1961, from Perri as president of American Guaranty Corporation, to Sokol, Comptroller of Hydromatics confirmed commitment to purchase 10,000 shares of the $6. stock to be issued 7000 shares to State Street Capital Corporation and 3000 shares to United Guaranty. On December 27, 1961 State Street Capital mailed its check to Hydromatics for $42,000 for 7,000 shares of the stock, and on December 29, Hydromatics wrote State Street acknowledging receipt of the check, forwarding copies of the stock purchase agreement and investment letter to be signed and returned, and advising that the transaction would be complete upon receipt by Hydromatics of those executed documents. The executed documents were returned on January 12, 1962. On December 28, 1961 United Guaranty Corporation sent its check to Hydromatics for $18,000 for 3,000 of the $6. shares, and, on the following day, Hydromatics acknowledged receipt of the check and forwarded copies of the stock purchase agreement and investment letter to United Guaranty to be signed and returned; stating that the transaction would be complete upon receipt of the executed documents. They were mailed back January 2, 1962.

During the negotiations between Hydromatics and Ludwig, Mansfield, Vice President of Empire Trust, had several telephone conversations with Moss regarding the latter's progress in raising

equity capital in lieu of furnishing security for the bank's note. On December 26, 1961 Moss told Mansfield that he and his associates would purchase between $84,000 and $90,000 worth of stock at $6. per share, and that he had an offer from a small business investment corporation, which he intended to consummate within the then next succeeding two weeks to purchase $100,000 worth of the stock. Two days later, Moss informed Mansfield that he and his associates had put up between $140,000 and $150,000 as of that date, and that he had received a substantial commitment from a small business investment company. These representations were confirmed by Sokol in his letter to Mansfield of December 29, which stated that Hydromatics had been successful in securing approximately $300,000 in equity capital, and that the transaction would be closed prior to December 31. He also advised Mansfield that the company was negotiating with other investors for additional amounts. On the same date (Friday, December 29, 1961) Hydromatics notified the American Stock Exchange that its management had been exploring means for additional financing, and that a substantial amount of equity capital was in process of being raised by private placement with a group of investors.

Although the Hydromatics' directors meeting was held on December 21, 1961, the Assistant Secretary of the Corporation, the defendant Nathan, did not prepare the minutes until several weeks later. Necessarily, the names of the prospective investors and number of shares to be issued to each were not disclosed at the meeting, but were subsequently compiled in a list made up ten days or two weeks later, and then attached to the minutes of the meeting of December 21. Also the minutes do not mention the penalty clause suggested by Ludwig on December 27, 1961. Other infirmities are that although the directors knew that the company's financial picture had begun to change, no mention of that improvement is made in the minutes.

According to the minutes, the Board Meeting on December 21, 1961 was a special one attended by all five members of the board. The President and principal stockholder of the corporation reminded his co-directors that a need for additional invested capital had become apparent earlier in the year due to the increase in the extent of the inventory required in connection with the developing commercial and industrial line of valves and to take care of future growth of the company. He reported that many different avenues of securing such permanent financing had been explored, but that the obvious solution to the problem was sale of the stock of the corporation by means of an underwriting. This method was criticized as involving serious problems by reason of losses incurred by the corporation during the last preceding fiscal year which would create an adverse effect upon the price which might be secured for a stock issue. It was then considered that financing by borrowings from banks offered a temporary but not a permanent solution; such method having been employed in obtaining the loans from Empire Trust Company. The Directors were informed that efforts to obtain an underwriting for a stock issue had been made, but without success. Because the need for liquid working capital had become critical by reason of the accrual of past due bills jeopardizing the credit standing of the company, immediate steps were required to deal with the situation. As an additional factor, Moss mentioned that "under the terms of the Empire Trust Company Agreement the term loan is in default, placing the company in serious jeopardy." That default had been the subject of numerous discussions with the bank, which had insisted that the corporation raise additional working capital to the extent of increasing net worth "by $400,000 prior to December 31, 1961." The meeting was further advised that management's attempt to interest some private investors offered a dim prospect of success, but that other potential investors, acquainted with the management and prospects of the company, had indicated a willingness

to invest in its stock. Moss stated that "since they are going to acquire unregistered stock which they are to hold for investment, they have insisted that the price of the stock be made sufficiently attractive to warrant making the investment under the circumstances", and that their interest was conditioned upon a proviso that the cost of the stock be fixed at 4 "points below the market price at this time", and that, as an additional condition to their investment, the officers and directors should "indicate their good faith and confidence in the company and its future prospects by purchasing stock at the same price as said private investors in a substantial amount, and that the President personally invest at least $50,-000 in such investment stock." Accordingly, Mr. Moss, recommended that the corporation enter into agreements to sell a total of $600,000 common unregistered stock of the company, to a limited number of private investors (not in excess of 15), including some small investment companies; the stock to be acquired for investment, and not for resale, and to be offered at a price per share of $4.00 below the market price of approximately $10, or at a price of $6.00 per share. "All subsequent offerings to the extent of the amount of stock authorized to be sold but not subscribed for at this time may be offered at a price determined by a discount of $4. from the approximate market price at the time of closing." The Board of Directors concurred in the president's recommendation "that management agree to purchase common stock of the company at the same price to meet the conditions imposed by private investors in an aggregate of approximately $152,004." The president further stated that it was necessary, in order to comply with the requirements of the contemplated private investors that the corporation agree that "on or before the expiration of 18 months from the date of the agreement with [them] * * *, the company prepare and file, at its own cost, such proceedings as may be necessary to cause any shares so issued for investment to be registered pursuant to the Federal Securities Exchange Act of 1933 [sic] as

amended, to the end that said shares issued pursuant to the recommendations to be hereinafter made shall be qualified for public sale and distribution." In conclusion Moss stated that his co-director, Brooks, had informed him that he (Brooks) had discussed the matter with a private investor, who had agreed to purchase $50,000 of investment stock at $6. a share "upon the condition that the directors, including the President, would likewise purchase said investment stock and that this investor had about three friends in New York who would also invest on a similar basis."

The meeting accordingly resolved:

(1) The appropriate officers be authorized to issue up to 100,000 shares of the common stock of the corporation "to be sold for private placement to a limited number of investors, at such prices as shall be obtainable for such investment stock, to be paid for in cash and upon such additional terms and conditions as may be required." The resolution recited that the stock to be offered for sale was not registered, and, because it was to be investment stock, would be exempt from registration; but that appropriate application for listing the stock on the American Stock Exchange should be made as promptly as possible.

(2) The appropriate officers of the corporation be authorized to enter into agreements with private investors (whose names and subscriptions would be subsequently furnished) for not in excess of 100,000 shares at $6. per share, and to obtain the consent of such investors that the stock so acquired would be "for investment and not for resale publicly."

(3) The corporation agreed prior to the expiration of 18 months from the date of the stock issue to take such proceedings as might be necessary to cause the shares sold to the investors to be registered or otherwise qualified or exempted from registration pursuant to the Securities Act of 1933 as amended; and that such agreements (with the private investors) contain such other terms, conditions and representations as were deemed necessary by the company or its counsel.

The Directors also authorized the corporation to apply to list on the American Stock Exchange, as expeditiously as possible, "such additional shares as may be sold", and the appropriate officers to issue common stock of the company to private investors "totalling not in excess of 15 in the aggregate (including those private investors referred to in the prior resolution), for the sum representing the difference between $600,000 and $387,204, the amount obtained by the private sale referred to in the foregoing resolutions, to wit, the sum of $212,796, * * * at a price of $4.00 below the approximate market price at the time of the closing of such private placement." The authority conferred by the foregoing resolutions was expressly limited to a period of 30 days from December 21, 1961.

The subject of the sale of the $6. shares had been discussed and the price set by the directors several weeks prior to December 21, 1961, and early in the month Brooks had told Ludwig (who became one of the private investors to the extent of 8,500 shares) that the corporation was interested in selling stock at $6. per share. At the directors' meeting of December 21, it was the understanding of Moss, that no private investor other than Ludwig had suggested that any director other than Moss participate in the stock purchase. Ludwig denied that he had ever required Moss or any other director to participate in the purchase prior to Ludwig's execution of his stock purchase agreement on December 28, 1961.

### THE COMMON LAW COUNT

The complaint alleges, "The issuance of said shares was fraudulent, contrary to the rights of other stockholders, not at fair market value, and at an inadequate consideration, and has resulted in diluting the equity of other shareholders including the plaintiffs, to the benefit of the defendants and the other persons to whom the said 64,534 shares were issued. It has resulted in damage to Hydromatics because the corporations [sic] did not receive a reasonable price for the shares so issued." There is no criticism of the

form of financing employed. The sole issue is the reasonableness of the price for which the shares were sold.

This count, alleging common law fraud, must be considered in the light of the common law of the State of New Jersey. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The term "fraud" has been used in the State of New Jersey to designate what is really an action on the case for deceit, Byard v. Holmes, 34 N.J.L. 296 (1879), or an action for deceit, Anderson v. Modica, 4 N.J. 383, 389, 73 A.2d 49 (1950). There are five necessary elements to maintain an action for deceit in New Jersey. Id. The elements are: (1) a representation by defendant to the plaintiff with intent that the latter rely upon it; (2) knowledge on the part of defendant that the representation is in fact false; (3) belief by the plaintiff that the representation is true; (4) reliance on such representation; and (5) the taking of action and consequent injury. Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J.Super. 369, 379–380, 164 A.2d 607, 612 (1960), citing, among other cases, Fischetto Paper Mill Supply, Inc. v. Quigley Co., Inc., 3 N.J. 149, 152–153, 69 A.2d 318, 320 (1949). The burden of proof is upon the plaintiff. Id. The quantum of proof necessary to sustain this burden is " * * * the greater weight of the evidence * * * ". Fischetto Paper Mill Supply, Inc. v. Quigley Co., Inc., supra, 3 N.J. at 155, 69 A.2d at 321. Armel v. Crewick, 71 N.J. Super. 213, 218, 176 A.2d 532, 535 (1961) indicates that an examination of *Fischetto* suggests that " * * * the greater weight of the evidence * * * " means " * * * a preponderance of the evidence * * * ". The plaintiff, therefore, to prevail on this count must allege and prove the elements set forth above.

I hold that the common law count cannot be sustained under the law of New Jersey. The Certificate of Incorporation of Hydromatics set forth the total authorized capital stock: 500,000 shares of common stock of the par value of $1.00 each. Up to the date of the

transaction complained of, Hydromatics had issued and outstanding, or reserved for issuance, 318,000 shares. There were remaining 182,000 shares of unissued but authorized capital stock. The Certificate of Incorporation set forth, as one of the objects of the corporation, "To buy, sell, hold and reissue the stocks, bonds or other securities of this corporation." The Certificate of Incorporation empowered the Board of Directors to "* * * exercise all corporate powers, except as otherwise provided by statute * * *". This included the power to authorize the issuance and sale of additional capital stock subject, of course, to the provision of N.J.S.A. 14:8–1 that par value stock may not be issued at less than its par value. The Board of Directors could also create optional rights to purchase or subscribe to stock of any class; and could create preemptive rights as determined in its sole discretion as to both amount and price. The Board, therefore, needed no prior approval of the stockholders in order to authorize the issuance of the 64,534 shares. Though the Board needed no prior approval, the stockholders nonetheless purportedly ratified this transaction on February 8, 1962, with full knowledge of the directors' interest which was contained in the Proxy Statement. "When stockholders have notice of the director's interest and authorize the directors to enter into a contract, the agreement will be unassailable in the absence of actual fraud or want of power in the corporation." Eliasberg v. Standard Oil Co., 23 N.J.Super. 431, 441, 92 A.2d 862, 867 (1952), affd. per curiam 12 N.J. 467, 97 A.2d 437 (1953). The plaintiff relies upon the following language contained in Hill Dredging Corp. v. Risley, 18 N.J. 501, 531, 114 A.2d 697, 713 (1955):

> "Where a director enters into a contract or transaction with his own corporation, *without the approval of the stockholders first having been obtained,* the burden is upon the director to completely justify the transaction. Eliasberg v. Standard Oil Co. of N. J., supra." [Emphasis added]

However, the Certificate of Incorporation states that "* * * any director individually * * * may be a party to or may be pecuniarily or otherwise interested in any contract or transaction of this corporation, *provided* that the fact that he * * * is so interested *shall be disclosed or shall have been known* to the Board or a majority thereof * * *". [Emphasis added] This transaction, therefore, was *prima facie* valid, and cannot be successfully attacked without proof that it was of such a character that the stockholders could not authorize it in advance or ratify it, or that it was fraudulent. See Helfman v. American Light & Traction Co., 121 N.J.Eq. 1, 14, 187 A. 540 (1936). As a matter of fact, this transaction was authorized in advance, by the Certificate of Incorporation. This does not mean, however, that the provisions in the Certificate of Incorporation preclude the Court from scrutinizing the transaction with respect to fairness. Had the plaintiff shown, which he did not, that the transaction was not honest, fair and reasonable, the burden to produce evidence would then shift to the defendants to show the transaction to be honest, fair and reasonable. See Abeles v. Adams Engineering Co., Inc., 35 N.J. 411, 428, 173 A.2d 246, 255 (1961). The burden of proof as to the fairness of a transaction in which the directors personally participate is not upon the Board of Directors where it can be shown that the act done was permissible, that the act was done with full disclosure to the stockholders, and absent a showing that the transaction was unfair in regard to the corporation. Plaintiff's reliance on Eliasberg v. Standard Oil Co., supra, and Hill Dredging Corp. v. Risley, supra, to support the proposition that the burden of proof is upon the directors to justify this transaction, is not well-founded. In *Eliasberg,* the stockholders had notice of, and approved, the plan of the directors. In *Hill Dredging,* there was no quorum present, and the purported action taken was not the act of the corporation, was not binding upon it, and was a nullity. The only question

remaining under this count is whether this Court can infer, from the disparity between the $6. purchase price and the fair market value of this stock as evidenced by those shares then registered and listed on the American Stock Exchange minus a reasonable discount, that the purchase price of the $6. shares was so unreasonably low as to amount to fraud? The answer is no. "The power to issue and sell permits issuance for any consideration properly fixed by the board of directors." Hodge v. Cuba Co., 142 N.J.Eq. 340, 345, 60 A.2d 88, 92 (1948). The plaintiff has not carried the rather strict burden necessary to make out a case under the common law for fraud. The New Jersey cases, in setting the standard for directors who enter into contracts affecting the corporation, indicate that such contracts are voidable where negotiated *without the knowledge and consent of the stockholders.* Daloisio v. Peninsula Land Co., 43 N.J.Super. 79, 88, 127 A.2d 885, 890 (1956). This is not such a case. Judgment must go for defendants upon the first count.[5]

### SECTION 10(b)

■ Hydromatics' issuance of the $6. shares was a stock transaction to which the anti-fraud policy expressed in Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b) extends. Hooper v. Mountain States Securities Corp., 5 Cir. 1960, 282 F.2d 195; cert. den. 1961, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693; McClure v. Borne Chemical Co., 292 F.2d 824 (3rd Cir. 1961) cert. den. 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961) [By Implication].

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), declares it to be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facilities of any national securities exchange—"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

■ The rule-making power granted by the foregoing statutory section to the Commission (S.E.C.) was implemented by its adoption of Rule X–10B–5, 17 C.F.R. 240.10b–5. That rule proscribed (1) the employment of any device, scheme, or artifice to defraud; (2) the making of any untrue statement of a material fact, or the omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) the engagement in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. The rule was patterned upon the language of § 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a), but added words to cover fraud if perpetrated on sellers as well as purchasers. Rule X–10B–5 extended to *sellers* the same protection, against fraudulent and other unlawful schemes, which has been afford-

---

5. "State court decisions involving fraud and misrepresentation are applicable only indirectly as supplementary aids in establishing standards of diligence. Congress has established its own standard which is to be measured by federal law interpreting the statute and the rule unhindered by restrictive applications of state common law." Kohler v. Kohler Co., 319 F.2d 634, 642, 7 A.L.R.3d 486 (7th Cir. 1963). See Stevens v. Vowell, 343 F.2d 374, 379 (10 Cir. 1965) and Carliner v. Fair Lanes, Inc., 244 F.Supp. 25, 28–29 (D.Md. 1965) where it is stated that it is

not necessary to allege or prove common law fraud to make out a case under Section 10(b) and Rule X-10B-5. Kohler v. Kohler Co., 319 F.2d 634, 642 (7 Cir. 1963). In this framework, I move to a consideration of the federal statutory counts; it being clear that facts, which may justify recovery under Section 10(b) and Rule X-10B-5, may possibly not justify recovery under the common law of New Jersey. See Kohler v. Kohler Co., 208 F.Supp. 808, 823 (E.D.Wis.1962), affd. 319 F.2d 634 (7 Cir. 1963).

ed *purchasers* of securities. Hooper v. Mountain States Securities Corp., supra, 282 F.2d at 201.

 To make out a case under the statute and Rule X–10B–5, the plaintiff must prove that, as factors of material importance in the alleged transaction, (1) the defendants used the mails or instrumentalities of interstate commerce (2) there was a purchase or sale of a security, and (3) the defendants used a manipulative or deceptive device. Stevens v. Vowell, 343 F.2d 374, 378 (10 Cir. 1965). The evidence indicates that there was use of the mails in regard to the sale of the $6. shares. Investment letters were sent to private investors and small business investment corporations. Letters in regard to this issue of stock were also sent to the National Newark and Essex Banking Company and the National State Bank of Newark. Ample evidence of actual sale of the $6. shares is present. The requirement of the use of a manipulative or deceptive device is evidenced by the fact that the directors and officers of Hydromatics, Inc. purchased some of these $6. shares before their participation in this distribution of stock was completed.[6] I therefore conclude that the defendant directors violated Rule X–10B–5.

"All that is required to establish a violation of section 10 is a showing that a means, instrumentality ór facility of a kind described in the introductory language of that section was used, and that in connection with that use an act of a kind described in section 10(a) or (b) occurred."

Matheson v. Armbrust, 9 Cir. 1960, 284 F.2d 670, 673, cert. den. 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed.2d 860; citing Errion v. Connell, 9 Cir. 1956, 236 F.2d 447, 455. See also Fratt v. Robinson, 9 Cir.

1953, 203 F.2d 627, 634, 37 A.L.R.2d 636; Stevens v. Vowell, 10 Cir. 1965, 343 F.2d 374, 378–379.

## RULE X–10B–5 DAMAGES

 The corporation's *actual* damages are recoverable. 15 U.S.C.A. § 78bb(a); Mills v. Sarjem Corp., 133 F. Supp. 753, 770 (D.N.J.1955); Meisel v. North Jersey Trust Co. of Ridgewood, N. J., 216 F.Supp. 469 (S.D.N.Y.1963); Speed v. Transamerica Corp., 135 F.Supp. 176, 186 (D.Del.1955), modified on other grounds, 235 F.2d 369 (3 Cir. 1956). No punitive damages are recoverable. Meisel v. North Jersey Trust Co. of Ridgewood, N. J., supra. The actual discounts, as applied to the average market price, on the respective material dates under Rule X–10B–5 were as follows:

| Date | Average Market Price | Discount |
|------|----------------------|----------|
| 12/28/61 | 13¼ | 45% |
| 12/29/61 | 14¹⁄₁₆ | 42% |
| 1/2/62 | 15½ | 38% |

The expert testimony set forth a wide range of permissive discount which, under the facts here, is neither very helpful nor highly persuasive. I have concluded that a reasonable discount, under all the facts and circumstances of this case, was 20%. The measure of damages is the difference between the total price paid at $6. per share and the total price paid at 20% discount of the average market price on the date of the respective purchases. This measure of damages is to be applied to the respective directors individually for the $6. shares personally acquired. It is also to be applied to the $6. shares which were sold to the Trust. As to these shares, the liability of Moss and Britton, as sole members of the Administrative Committee, is joint and sev-

---

6. "Manipulative or deceptive device" is defined in Rule X-10B-6, 17 C.F.R. 240.10b-6(a) (2), as including those transactions in which a person, who participates in the distribution of the securities, also bids for these securities or purchases them for an account in which he has a beneficial

interest. See Securities and Exchange Commission v. Scott Taylor & Co., 183 F. Supp. 904, 906–909 (S.D.N.Y.1959); Securities and Exchange Commission v. Electronics Security Corp., 217 F.Supp. 831, 836–838 (D.Minn.1963).

eral. The Administrative Committee, by letter dated December 21, 1961 to Brooks as Trustee, authorized the purchase of 5,000 of the $6. shares. Brooks as Trustee incurs no liability in regard to the purchase of these shares. The Employees' Profit Sharing and Retirement Plan, in Article II, paragraph 2, confers complete control of administration upon the Administrative Committee. Article VI, paragraph 1 of the Plan requires the Trustee to operate pursuant to the Committee's direction. The Trust Agreement, in Article I, paragraphs 2, 3 and 5, and in Article IV, paragraph 1, requires the Trustee to follow the directions of the Committee. Article IV, paragraph 3 of the Trust Agreement relieves the Trustee of any liability incurred in following the directions of the Administrative Committee. See Restatement (Second), Trusts § 185, comment b (1959). Article II, paragraph 5 of the Plan contains the following provision:

> "No member of the Committee shall be liable to the Company, to the Trustee, to the members, or to any beneficiary or the legal representative of any member, for anything done or omitted to be done, *excepting only for fraud, bad faith or gross negligence.*" (Emphasis added)

This provision cannot serve to exonerate Moss and Britton since the exception contained therein is sufficient to encompass the proscription of Section 10(b) and Rule X–10B–5. See Restatement (Second), Trusts § 185, comment h (1959).

On December 28, 1961, the average market price was 13¼. Applying the 20% discount to this average market price, and computing according to the measure of damages set forth above, the damages assessed against the directors severally for their respective individual purchases on December 28, 1961 are as follows: [7]

| Directors | Shares Purchased | Damages |
|---|---|---|
| Moss | 8500 | $39,100.00 |
| Britton | 4167 | 19,168.20 |
| Brooks | 8500 | 39,100.00 |
| Nathan | 2500 | 11,500.00 |
| Sokol | 1467 | 6,748.20 |
| | | $115,616.40 |

An accounting must now be had for the 3900 shares sold to the Trust.[8] On December 29, 1961, the average market price was 14½6 ($14.06). On this date, 3900 $6. shares were sold to the Trust.[9] The damages are $20,475.00; $10,237.50 as to Moss, and the same amount as to Britton.

Thus, the total damages under Rule X–10B–5 are set forth as follows:

| | Several | Joint and Several | Total |
|---|---|---|---|
| Moss | $ 39100.00 | $ 10237.50 | $ 49337.50 |
| Britton | 19168.20 | 10237.50 | 29405.70 |
| Brooks | 39100.00 | | 39100.00 |
| Nathan | 11500.00 | | 11500.00 |
| Sokol | 6748.20 | | 6748.20 |
| | $115,616.40 | $20,475.00 | $136,091.40 |

7. An additional 200 shares purchased by Sokol are accounted for under Section 16 (b) damages.

8. There were 5,000 shares purchased by the Trust, but 1100 of these shares have been accounted for under Section 16(b) damages. This leaves 3,900 shares.

9. See Footnote 8.

## SECTION 16(b)

Section 16(b) of the Act, 15 U.S.C.A. § 78p, applies only to registered securities listed on a national securities exchange. Section 16(b) must be read in conjunction with § 16(a) in order to determine who is "such * * * director" who may be liable under § 16(b). Heli-Coil Corp. v. Webster, D.N.J.1963, 222 F. Supp. 831, 836, affd. mod. 3 Cir. 1964, 352 F.2d 156, 160. Where, as here, the corporation has any equity securities registered on an exchange, its directors are required by § 16(a) of the Act to report all of their equity securities in the corporation and such directors would qualify as "such * * * director" who might be liable under § 16(b). Petteys v. Northwest Airlines, Inc., D.C.Minn.1965, 246 F.Supp. 526. In Western Auto Supply Co. v. Gamble-Skogmo, Inc., 8 Cir. 1965, 348 F.2d 736, cert. den. 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966), a corporate insider who purchased shares of stock of an issuing corporation for the purpose of contributing so much thereof as might be necessary to discharge the corporation's obligation to its profit sharing stock bonus trust fund, and did in fact transfer most of the shares so purchased to the fund, was liable after sale of the stock within six months of its purchase for the short swing profit on the shares transferred.

The defendants Moss, Britton and Sokol,[10] as directors and officers of Hydromatics, were required by § 16 of the Act to file within ten days a statement with the American Stock Exchange, and duplicate original thereof with the S.E.C. of the amount of all equity securities of Hydromatics of which each of them was the beneficial owner and within ten days after the close of each month thereafter a statement with duplicate original to the Commission indicating his ownership at the close of that month and such changes in his ownership as had occurred during the month. Subsection (b) of the same Section states the following requirements: "For the purpose of preventing the unfair use of information which may have been obtained by * * * [him] by reason of his relationship with the issuer [Hydromatics], any profit realized by him from any purchase or sale, or any sale and purchase, of any equity securities of such issuer * * * within any period of less than six months, * * *, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such * · * * director * * * in entering into such transaction of holding the securities purchased or of not repurchasing the securities sold for a period exceeding six months." The same subsection provides that "Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any securities of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; * * *." This subsection shall not be construed to cover any transaction where such beneficial owner [director] was not both at the time of the purchase and sale, or the sale and purchase, of the securities involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." Defendants Moss, Britton and Sokol were not within the exception stated in the last foregoing quoted sentence.

Besides being directors and officers of Hydromatics, defendants Moss and Britton were the sole members of the Administrative Committee, and the defendant Brooks was the sole trustee of Hydromatics Employees Profit Sharing and Retirement Trust during the same period.

---

10. Defendant Sokol made a purported settlement with the corporation of its claim for his short swing profit. This settlement cannot be sustained. To sustain a settlement for an amount which would be substantially less than the amount recoverable under the statute would be against public policy. Blau v. Hodgkinson, 100 F.Supp. 361, 371 (S.D.N.Y.1951).

While title to the assets of the Trust was vested in the Trustee, the members of the Administrative Committee were charged with the entire duty of its administration. Brooks, the Trustee, therefore, was a mere custodian of the assets of the Trust and acted or refrained from acting as directed by the Administrative Committee.

It was admitted by the defendants that the Trust sold 1100 shares of stock of Hydromatics on the American Stock Exchange as disclosed by the following schedule:

| Trade Date | Number of Shares | Price Per Share | Net Amount Received |
|---|---|---|---|
| Dec. 27, 1961 | 100 | 12¾ | $1,251.70 |
| Dec. 27, 1961 | 100 | 12¾ | 1,251.70 |
| Dec. 27, 1961 | 100 | 12¾ | 1,251.70 |
| Dec. 27, 1961 | 100 | 13 | 1,276.45 |
| Dec. 28, 1961 | 100 | 13 | 1,276.45 |
| Dec. 27, 1961 | 100 | 13¼ | 1,301.20 |
| Dec. 28, 1961 | 100 | 13 | 1,276.45 |
| Dec. 29, 1961 | 100 | 13⅝ | 1,338.28 |
| Dec. 29, 1961 | 100 | 13¾ | 1,350.66 |
| Jan. 2, 1962 | 200 | 15¼ | 2,998.23 |

———◆———

There was evidence that defendant Brooks, as Trustee of the Trust, pursuant to the instructions of Moss and Britton purchased 5,000 of the $6. shares of Hydromatics in December, 1961.

■■■■ Moss and Britton were pecuniarily interested in the Trust as beneficiary members. On August 31, 1961, Trustee Brooks set forth the value of the membership shares owned respectively by Moss and Britton both in dollar amounts as of that date and percentage of interest in the Trust. The interest of Moss was 23.79% and that of Britton 14.66%. The percentage interest of each of these defendants was not shown to have decreased between August 31, 1961 and January 2, 1962. The dollar interest of defendants Moss and Britton between September 1, 1961 and August 31, 1962 depended upon the evaluation of the Trust assets on any particular day and reassignments of the interest of the various other employee members who died, resigned or otherwise lost their memberships in the Trust during the year. Since the defendants controlled the corporation and only the corporation could terminate the Trust, the minimum percentage interest of Moss and Britton in the Trust assets when the Trust made purchases and sales of Hydromatics stock in December, 1961 and January, 1962 was not less than the percentages set forth in Brooks' report of August 31, 1961. The Trust received a gross amount of $14,572.82 for the 1100 shares of Hydromatics stock which it sold between December 27, 1961 and January 2, 1962 and the Trust purchased more than a like amount of shares from the corporation in December, 1961 at a price of $6. per share, paying $6,600 for 1100 shares. The Trust made a profit of $7,972.82 on these transactions. This profit is recoverable by the corporation from Moss and Britton under § 16(b). Alternatively not less than the percentage shares of the Trust owned by Moss and Britton at the time of the foregoing transaction may be applied to the profits of Moss and Britton. This would entitle the corporation to recover 23.79% of $7,972.82, or $1,896.73 from Moss and 14.66% of $7,972.82 or $1,168.82 from Britton.

■■■■ With respect to defendant Sokol, the evidence discloses that on December 22, 1961, he sold 100 shares of Hydro-

matics stock on the American Stock Exchange. The price per share was 10⅝. The net amount received by Sokol was $1,041.40. On December 26, 1961, Sokol sold 100 shares of Hydromatics stock on the American Stock Exchange. The price per share was 11. The net amount received by Sokol was $1,078.53. The total net amount received by Sokol from those two transactions was $2,119.93. Sokol purchased 1667 shares of the $6. stock on December 28, 1961. The price of 200 of these shares was $1,200.00. Matching the purchase price of 200 of the $6. shares with the total net amount received by Sokol in the American Stock Exchange transactions, the profit to Sokol was $919.93. Sokol is liable to the corporation in damages for this amount. His purported settlement with the corporation for $100.00 may be deducted from this figure, leaving damages of $819.93.

▮ The corporation shall have interest on the damages, assessed herein under Section 16(b), from the date of sale. Western Auto Supply Co. v. Gamble-Skogmo, Inc., supra at 744.[11]

## TOTAL STATUTORY DAMAGES

The figures below include both Section 16(b) damages and Rule X–10B–5 damages.

| | Rule X–10B–5 | Section 16(b) | Total |
|---------|-------------|---------------|--------------|
| Moss | $ 49337.50 | $1896.73 | $ 51234.23 |
| Britton | 29405.70 | 1168.82 | 30574.52 |
| Brooks | 39100.00 | | 39100.00 |
| Nathan | 11500.00 | | 11500.00 |
| Sokol | 6748.20 | 819.93 | 7568.13 |
| | $136,091.40 | $3885.48 | $139,976.88 |

I find for the defendants on the common law count for fraud. I find for the plaintiff on the statutory counts under Section 16(b) and Rule X–10B–5, respectively. An appropriate order may be submitted in accordance with the views herein expressed.

## ON MOTION OF PLAINTIFFS TO AMEND OPINION FILED MAY 6, 1966 AND CROSS-MOTION OF INDIVIDUAL DEFENDANTS TO AMEND THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, pursuant to Rule 52(b), F. R.Civ.P., moved to amend and supplement this Court's opinion filed May 6, 1966. Defendants, with the exception of Hydromatics, Inc., made a cross-motion for amendments to this Court's findings of fact and conclusions of law, and also opposed plaintiffs' motion. Briefs were submitted for the respective parties, and oral argument was heard on June 27, 1966. At the conclusion of this hearing, I reserved decision on the contentions presented. This is the embodiment of the decision so reserved.

▮ As to plaintiffs' motion, the corporation shall have interest from the date of sale on the damages assessed under S.E.C. Rule X–10B–5 in the opinion filed May 6, 1966.[1] See Speed v. Transamerica Corp., 135 F.Supp. 176, 203 (D.Del.1955) aff'd as modified 235

11. The date of sale as to Moss and Britton was December 29, 1961; as to Sokol, December 28, 1961.

1. The date of sale as to Moss, Britton, Brooks, Nathan, and Sokol, individually, was December 28, 1961; as to Moss and Britton as the sole members of the Administrative Committee, December 29, 1961.

F.2d 369, 374 (3rd Cir. 1956). In all other respects, plaintiffs' motion is denied; it appearing that none of the other requested additional findings is warranted by the evidence. Bartol v. McGinnes, 194 F.Supp. 82 (E.D.Pa.1961).

Defendants' cross-motion is in all respects denied for the same reason, and upon the same authority, which constitutes the basis of the denial of all of the plaintiffs' motion except the allowance of Rule X–10B–5 interest. It should be noted that defendants, in urging the Court to find that the corporation's claim for Sokol's short swing profit had been satisfied, relied upon an exhibit [2] in evidence, and a portion of Sokol's testimony in regard to his purported settlement with the corporation. Sokol testified that he prepared the memorandum which was admitted into evidence as Defendant's Exhibit D–12, and that this memorandum was executed after he had left the corporation. The memorandum bears neither the signature of Sokol nor the signature of any other person. It is not dated, and does not specifically set forth the circumstances under which it was executed. I find this evidence not persuasive, and adhere to the views expressed in my opinion of May 6, 1966.

Plaintiffs' motion, except so much thereof as seeks inclusion of Rule X–10B–5 interest, is accordingly denied. Defendants' cross-motion is denied in its entirety. An appropriate order may be submitted in accordance with the views expressed in this Court's opinion of May 6, 1966, to include the views herein expressed in regard to the allowance of Rule X–10B–5 interest.

2. Defendant's Exhibit D–12, in substance:

Balance for time spent with officers, directors, etc. on pending matters.