George P. PAPPAS et al., Plaintiffs,

v.

Bernard L. MOSS et al., Defendants.

Civ. A. No. 96–62.

United States District Court
D. New Jersey.

June 25, 1969.

Order Amending Opinion
Sept. 30, 1969.

1258

Bourne, Schmid, Burke & Noll, by Edward T. Kenyon, Summit, N. J., for plaintiffs; Burke & Burke, by George I. Harris, New York City, of counsel.

Clapp & Eisenberg, Newark, N. J., by Jerome C. Eisenberg, Newark, N. J., for individual defendants.

McGlynn, Stein & McGlynn, Newark, N. J., by Roger H. McGlynn, Newark, N. J., for defendant Hydromatics, Inc.

Edward I. Nathan, General Counsel for Hydromatics, Inc.

## SUPPLEMENTAL OPINION

### WORTENDYKE, District Judge:

The judgment of this Court entered upon its Opinion, reported in 257 F.Supp. 345, was reversed by the United States Court of Appeals for the Third Circuit whose Opinion was filed April 8, 1968 and reported at 393 F.2d 865.

Plaintiff brought this stockholders' derivative action on behalf of Hydromatics, Inc., a New Jersey corporation, asserting claims under the common law and under the Securities Exchange Act of 1934 as amended, 15 U.S.C. § 78aa. Each of the asserted claims is based upon alleged wrongdoing in connection with the sale of 64,534 shares of Hydromatic stock to defendants and others in private placement transactions at a price allegedly so far below the contemporaneous fair value of the shares as to amount to fraud.

As we understand the Opinion of the Appellate Court it directs this Court to resolve the following questions:

(1) Have the interested directors shown, by clear and convincing proof, that the transaction complained of was honest, fair and reasonable?

(2) Was there a direct violation of Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78p.(b) and its implementing Rule 10b–5 (17 C.F.R. 240–10b–5)?

(3) Did the Board of Directors cause their corporation to sell its stock to them and others at a fraudulently low price?

(4) If the "independent" stockholders were considered as standing in the place of the defrauded corporate entity at the time of the original resolution authorizing the stock sales was passed, was there such deception in the resolution as to bring it within the proscription of the Rule?

(5) Had Hydromatics standing, albeit derivately, to maintain this action under Rule 10b–5 in the circumstances of this case?

(6) What was the fair value, on the respective dates of sale, of the shares involved in the criticized transactions?

(7) What misrepresentations of fact appear in the minutes of the directors meeting of December 21 authorizing the sale of the shares and in the proxy material issued to obtain stockholder ratification?

This action was initially instituted by certain minority stockholders against a New Jersey corporation (Hydromatics), and three of its five officers and directors. Defendants Edward Nathan, and Philip Brooks as Trustee of the Employees' Profit Sharing and Retirement Trust, were joined in the amended and supplemental complaint. When the action was commenced, jurisdiction was predicated upon diversity of citizenship. Subsequent proceedings therein destroyed the diversity but invoked jurisdiction under a federal statute. Jurisdiction of the original single count of the complaint has, despite the destruction of diversity, been retained as pendent to the federal statute jurisdiction. The present defendants were the corporate officers and all of the directors at the time of the transactions in issue. There remains presently as sole plaintiff a Canadian corporation holding 1,700 shares of $1.00 par common stock of the corporation, out of a total of 352,534 shares issued and outstanding.

The plaintiff sues derivatively in the right of the corporation, and charges the defendant directors with breach of their common law obligations to the corporation and with violation of S.E.C. Rule 10b–5 adopted pursuant to § 10(b) of the Securities Exchange Act of 1934, as amended. Recovery is also sought of short swing profits, under § 16(b) of the

Act from defendants Moss and Britton; the claim thereunder against Sokol for $900 having been abandoned by stipulation.

The causes of action alleged are predicated upon the unanimous action of the corporation's board of directors in adopting a resolution on December 21, 1961 authorizing the issuance of 64,534 shares of the authorized, but theretofore unissued and unregistered, shares of the common stock, at a price of $6.00 per share, to themselves and other purchasers under agreements to hold the shares for investment purposes only, but providing that the corporation would cause the shares to be registered within eighteen months following the date of issue.

At the time of the adoption of the resolution there were issued and outstanding 318,000 shares of capital stock, all of the same class, which had been listed for trading on the American Stock Exchange since 1960. The original issue of Hydromatics' stock to the public was at a price of $10.00 per share.

During the period from January 1, 1961 to January 16, 1962, the price of the stock of the corporation being traded on the Exchange ranged between a low of 10⅜ and a high of 24⅞.

The corporation was engaged in the business of manufacturing ball valves. Its principal market had been in the military field, but during the year 1960 the corporation developed a new line of ball valves for the civilian market, for entry into which management had estimated that additional capital of $2,000,-000 would be required.

During the fiscal year ended August 31, 1961 the corporation had moved its plant to new leased quarters, in connection with which it incurred some extraordinary expense. Its net sales dropped from $3,621,160 in 1960 to $2,373,361 in 1961. During the 1960–1961 fiscal year, the corporation suffered a loss of approximately $215,000. It had outstanding debts consisting of a long-term unsecured bank loan of $500,-000 and a 90-day renewable note in the

amount of $350,000. The provisions of the note evidencing the larger of these items of indebtedness obligated the corporation to maintain an excess of its consolidated current assets over its consolidated current liabilities at not less than $650,000, and the ratio of its consolidated current assets to its consolidated current liabilities at not less than 1.75 to 1. The terms of this loan agreement further provided that in the event of the breach of any of the foregoing conditions, the lending bank might put the corporation on written notice of the default, and if the default persisted for thirty days thereafter the loan would become callable. For the fiscal year ended August 31, 1961 the corporation's pre-tax loss was $442,000; which, however, included $117,000 in engineering development costs charged against fiscal 1960-61 operations. Despite a small profit for the first quarter of fiscal 1961–62 ($16,-612 after taxes), the corporation was in need of additional capital. It was threatened not only with the calling or requirement of full collaterization of its long-term indebtedness, but it had also been refused delivery by an unpaid supplier, preventing the making of deliveries to a principal customer.

The resolution unanimously adopted by the directors of Hydromatics at the meeting of the board held on December 21, 1961, authorized the corporation to enter into agreements to sell a total of 100,000 common unregistered shares of stock of the company to a limited number of private investors, not in excess of 15, including some small investment companies; the stock to be acquired for investment and not for resale, and to be offered at a price per share of $4.00 below the market price (then approximately $10.00 per share), or at a price of $6.00 per share. The resolution also directed that management agree to purchase similar stock of the company at the same price, to meet the conditions imposed by the prospective private investors, in an aggregate of approximately $152,000, and that in further compliance with the requirements of the private investors the corporation agree

that "on or before the expiration of eighteen months from the date of the agreement with [them] * * * the company prepare and file, at its own cost, such proceedings as may be necessary to cause any shares so issued for investment to be registered pursuant to the Federal Securities Exchange Act of 1933 as amended, [sic] to the end that said shares * * * shall be qualified for public sale and distribution." The meeting was informed that one of the directors had discussed the proposed transaction with a prospective private investor who had agreed to purchase $50,000 of investment stock at $6.00 a share "upon the condition that the directors, including the president, would likewise purchase [such] investment stock, and that this investor had about three friends in New York who would also invest on a similar basis." A list of the private investors contemplated by the resolution was to be made up and attached to the minutes of the meeting after they had been written up at a subsequent date. Between December 21, 1961 and January 2, 1962, negotiations were had in behalf of the corporation, through certain of its officers, with various prospective private investors, and written sales agreements, and investment letters between the corporation and the respective private investors were drafted and executed. By the terms of these documents the corporation sold to the investor and the investor purchased from the corporation a specified number of shares of unregistered common stock of the corporation for a price of $6.00 per share. The investor agreed that he would hold these shares for investment and not assign or distribute the same, and the corporation agreed to cause the shares to be registered with the S.E.C. within a period of eighteen months from December 21, 1961; failing which the corporation would pay to the investor a penalty of ½ of 1% per share per month during such portion of the next succeeding eighteen months period as the shares remained unregistered.

A regular meeting of the stockholders of the corporation was noticed for and held on February 8, 1962. The notice of and proxy for that meeting dated January 26, 1962 advised the stockholders that the board of directors would seek stockholder approval of the action of the board in authorizing and consummating the sale of the $6.00 shares.[1] The notice also stated that the officers and directors would vote all of their shares, including the $6.00 shares which they had purchased from the corporation, in favor of ratification of the directors' action. The minutes of the meeting indicate that this purported ratification was made by a majority of 251,864 out of the 268,585 shares voted.

The present action was instituted after the resolution of the board of directors, but prior to the stockholders' meeting, and an application for a preliminary injunction to prevent the holding of the stockholders' meeting was denied by this Court's Order of February 8, 1962.

Plaintiffs stated their claim at pretrial conference as follows:

(1) Defendants caused the corporation to issue the $6. shares at less than true value, thus defrauding the corporation.

(2) Defendants falsely represented to the corporation that the private investors required that the directors participate in the purchase of the $6. shares; and that the price of $6. per share was prescribed by the private investors.

(3) Defendants falsely represented to the corporation that when the agreements for the purchase of $6. shares were entered into, the average price of Hydromatics stock traded on the American Stock Exchange was approximately $10.50 per share.

1. The resolution of the board of directors did not require ratification by the stockholders, nor did the certificate of incorporation of the company provide for stockholder ratification of the action of the board of directors.

(4) Defendants falsely represented to the corporation that they were acquiring the $6. shares for investment and not for public sale, although they knew at the time that some of them were selling previously acquired registered shares on the stock exchange.

(5) Short swing profits were made on stock of the corporation by insiders which are recoverable by the corporation under 15 U.S.C. § 78p(b).

The contentions of the defendants may be summarized as follows:

(1) Plaintiffs ratified and approved the transactions complained of and thereby waived their right to criticize them.

(2) The Board of Directors had authority to accomplish the criticized transactions and acted in good faith in doing so.

(3) The certificate of incorporation validates the transactions.

(4) The officers and directors were required to participate in the purchase of the $6. shares by the private investors as a condition precedent to participation by the latter therein.

(5) The $6. shares were issued under agreements of the purchasers to hold them for investment and not for resale.

(6) This Court was ousted of diversity jurisdiction by the addition of a party defendant of non-diverse citizenship.

(7) The price of $6. per share at which the registered stock was sold was fair and equitable.

(8) S.E.C. Rule 10(b) (5) is not available to the plaintiffs because they were neither buyers nor sellers of the securities.

(9) Section 16(b) of the Securities and Exchange Act of 1934 imposes no liability upon defendants Sokol, Britton or Moss because none of them made a profit through the purchase or sale of Hydromatics stock held by him for a period of less than six months.

The aggregate of 64,534 shares of the $6 stock which were issued, some on December 28, 1961 and others on January 2, 1962, were distributed as follows:

| Purchaser | Date of Sale | Number of Shares |
| --- | --- | --- |
| Saul Ludwig | December 28, 1961 | 8,500 shares |
| Harry Moses | January 2, 1962 | 4,000 shares |
| Robert Berkowitz | January 2, 1962 | 3,300 shares |
| Samuel Dorsky | January 2, 1962 | 4,200 shares |
| Seymour Lichtenstein | January 2, 1962 | 4,200 shares |
| State Street Capital Corp. | January 2, 1962 | 7,000 shares |
| United Guaranty Corp. | January 2, 1962 | 3,000 shares |
| Philip B. Brooks, Trustee of Hydromatics Employees Profit Sharing and Retirement Trust | December 29, 1961 | 5,000 shares |
| Bernard L. Moss | December 28, 1961 | 8,500 shares |
| Harrison J. Britton | December 28, 1961 | 4,167 shares |
| Leo N. Sokol and Francine Sokol | December 28, 1961 | 1,667 shares |
| Edward Nathan | December 28, 1961 | 2,500 shares |
| Philip B. Brooks | December 28, 1961 | 8,500 shares |
| | | 64,534 shares |

Before and after the criticized transactions, the defendants Moss, Britton, Sokol, Nathan and Brooks controlled the management and board of directors of the corporation through their ownership, in the aggregate, of a majority of the issued and outstanding shares of its stock, and their positions as officers and directors of the corporation.[2] Besides being a director of the corporation, Brooks was also trustee of its Employees' Profit Sharing and Retirement Trust.

Five critical fact issues emerge from the evidence:

(1) On what date were the criticized transactions consummated?

(2) Did the private investors fix the price of $6 a share as a condition of their purchase of the stock?

(3) Did these private investors impose, as a further condition for their participation in the $6. share purchase, the requirement that the officers and directors of the company, as evidence of their good faith, make investments in the stock substantially matching those of the investors?

(4) Was the price at which the $6 shares were sold so low as to defraud the corporation?

(5) Did certain officers and directors of Hydromatics make short swing profits in its stock?

318,000 shares were listed for trading on the American Stock Exchange (New York) on November 3, 1960. Their price range on the Exchange during the period January 1, 1961 to January 16, 1962 appears in the following table:

|  | High | Low |
|---|---|---|
| First Quarter | 22⅞ | 18⅛ |
| Second Quarter | 24⅞ | 17½ |
| Third Quarter | 18⅞ | 13 |
| Fourth Quarter | 14½ | 10⅜ |
| January 1–16, 1962 | 15⅞ | 13 |

an average high of 19.4 and low of 14.4. As of January 23, 1962, in consequence of their purchase of the $6 shares, the

2. Prior to the issuance of the $6 shares, the stockholdings of the officers and directors were on December 18, 1961:

| | |
|---|---|
| Moss | 126,175 shares |
| Britton | 43,400 shares |
| Sokol | 381 shares |
| Nathan | 201 shares |
| Brooks | 800 shares |
| | 170,957 shares |
| Brooks as Trustee of the Profit Sharing and Retirement Trust then owned | 1,100 shares |
| | 172,057 shares |

There were 288,000 shares of $1. par value issued and outstanding when the $6. shares were issued and an additional 30,000 shares had been reserved for issue in accordance with the provisions of an employees' stock option plan. The registered stock listed for trading on the American Stock Exchange had been selling, between December 28, 1961 and January 2, 1962, at a high of 15¾ and a low of 13. On January 17, 1962 the Exchange suspended all trading in Hydromatics stock. The suspension was removed February 15, 1962.

following defendant officers and directors of Hydromatics had become beneficial owners of the indicated numbers of shares of its common stock:

| | | |
|---|---|---|
| Bernard L. Moss | President and Director | 133,995 shares |
| Harrison J. Britton | Vice President and Secretary | 47,567 shares |
| Leo N. Sokol | Comptroller and Director | 1,848 shares |
| Philip B. Brooks | Director | 9,300 shares |
| Edward Nathan | Assistant Secretary and Director | 2,701 shares |
| Philip B. Brooks | As Trustee of Hydromatics Employees' Profit Sharing and Retirement Trust | 5,000 shares |

The corporation had initially concentrated upon the production of ball valves[3] for the military market; and by 1959 it had become the principal supplier of such valves for missiles, rockets, ground support, aircraft and submarine uses. In 1960 it developed a new line of ball valves for the civilian market. Management had estimated that it would require $2,000,000 in additional capital to enable the company to enter the new market. Accordingly, Arthur B. Little, Inc., a management consulting firm, was employed to investigate the company's actual and potential sales fields, and to project its prospects through the next five years. The Little Report, dated May 9, 1961, predicted a decline in sales during fiscal 1961, with the total dropping from $3,600,000 in 1960 to slightly less than $2,500,000 in 1961. That projection was substantially verified by actual audit of net sales in fiscal 1961, which amounted to $2,373,361. The same Report, as well as management's own estimates, predicted that the decline in military sales would end in 1961, and that thereafter the corporation would retain from 35% to 45% of the military market which it then enjoyed. Gradual increases in military sales after 1961 were projected, together with a sharp increase of sales for civilian use. The total sales estimated for fiscal 1962 was $3,600,000, and that for fiscal 1963, $5,000,000.

In 1960, in contemplation of entry into the civilian market, the company rented and took possession of a new manufacturing plant in Bloomfield, New Jersey. Prior to moving to the new location, management estimated the cost of moving and plant adaptation at $2,000,000. The corporation, however, began to lose progressively in its pursuit of civilian business, and fiscal 1961 was expected and proved to be a poor year. The year-end statement showed a pre-tax loss of $442,000, and a probable post-income tax loss of $215,000. This loss picture was found to reflect the following factors, namely, decline in military orders, interruption of production while moving plant to new location, cost of improvements in the new plant, expenses for engineering development, and the building of inventory for expected increased sales. The reduction in military orders had been foreseen by the officers and directors in 1960, prior to moving the plant to Bloomfield; and the earnings decline had been anticipated with accuracy prior to the release of the Little Report on May 9, 1961. It was hoped that such decline would be arrested in fiscal 1962. The actual fiscal 1961 pre-tax loss would have been approximately

3. A ball valve is a sphere mounted and rotated on an axis in a sealed chamber with a cylindered aperture drilled through the sphere at an angle of 90 degrees to the axis of rotation. When the sphere is aligned with an in-line flow of material through a tubular conductor, such flow becomes infinitely variable by means of a 90-degree rotation of the sphere.

$325,000, rather than $442,000, if $117,-000 in engineering development costs had not been written off against 1961 operations to avoid burdening future years with those expenses.

Management expected that fiscal 1962 would show a "turnaround" in the company's financial retrogression of 1961, and had supplied profit projections for fiscal years 1962–1965 to Granberry Marache & Co., investment bankers, in connection with an application to that firm for financing in the summer of 1961. Hydromatics projected its fiscal 1962 post-income tax profit at $100,000, without including the amount of its income tax claims filed in 1961, upon which refunds were expected during 1962. As early as September, 1961 the officers and directors expected that the first quarter of fiscal 1962 (September 1–November 30, 1961) would show a slight profit. Sales for that quarter were $938,458, providing income after taxes of $16,612. In the comparable period of fiscal 1961, sales had been $614,688, resulting in a net loss of $72,534 after taxes. The foregoing comparison was considered by management to reflect a probable continuing sales and earnings increase. The backlog of orders at the end of the first quarter of 1962 was nearly $2,000,000, compared to less than $1,000,000 at the end of the first quarter of fiscal 1961. Hydromatics' management was aware, prior to December 21, 1961, of the change disclosed by its quarterly figures for the period ending November 30, 1961. No program to raise the sum of $2,000,-000 in capital estimated as requisite to enable the company to expand into the civilian ball valve market was ever developed. Moreover, the company's expected inventory increase upon entering that market was reflected in a rise from $559,-000 at the close of fiscal 1960, to $1,344,-000 by November 30, 1961.

On May 24, 1961 Hydromatics borrowed $500,000 from Empire Trust Company, a New York bank, on a long term note. No part of this loan was repayable prior to August 31, 1962. As a condition to the granting of the loan, Hydromatics agreed that it would not permit the excess of its consolidated current assets over its consolidated current liabilities to be less than $650,000, nor the ratio of its consolidated current assets to its consolidated current liabilities to be less than that of 1.75 to 1. The note which evidenced the loan provided that, in the event of a breach of the foregoing conditions, the bank could put Hydromatics on written notice of the default, and, if the default then continued for 30 days thereafter, the loan would become callable. No such notice of default was ever given by the bank to Hydromatics, and the note continued to remain entirely unsecured. On May 24, 1961 Hydromatics borrowed an additional $350,000 from the same bank upon a short term 90-day note. This loan was renewed every 90 days, was completely unsecured and, although outstanding, was not due during December, 1961.

The lending bank received from Hydromatics, in the beginning of November, 1961, its profit and loss statement for fiscal 1961, and its balance sheet as of August 31, 1961. The long term note had not then been declared in default. However, the bank's analysis of the August 31 balance sheet disclosed that there were included among the debtor's consolidated current assets items which the bank considered improper. Accordingly, on November 24, 1961, the bank informed Hydromatics' management that it desired that the long-term note be secured by appropriate collateral. Hydromatics did nothing to assure the bank that the loan would be secured; but its President (Moss) advised the bank that he desired to raise equity capital as an alternative to posting security for the long-term note. On December 7, 1961 he informed the bank that he would raise such equity capital by the sale of Hydromatics' stock. On December 14, 1961, Mansfield, the Bank's Vice-President, advised Hydromatics by letter that the bank desired to have its loan secured in the event Hydromatics was unable to raise the equity capital which its President had previously stated he would

undertake to obtain. At this time Hydromatics was being pressed for payment by Lebanon Steel Foundry, a major supplier, which had stopped deliveries of material to Hydromatics, and had notified Newport News Shipyard, a principal customer of Hydromatics, that it would not resume deliveries until its account with Hydromatics had become current. In October and November, 1961, Hydromatics had given Lebanon two 90-day notes for sums aggregating over $100,000 on past due accounts. $75,000 was paid to Lebanon on account of this indebtedness out of the proceeds of sale of the $6 shares.

The Directors had held a special meeting on December 14, 1961, at which the President reported on discussions he had had with Frank Visceglia representing the owner of the fee of the company's new plant location. The minutes of that meeting report that a deal had been tentatively negotiated in which Mr. Visceglia's company had offered to buy a substantial number of shares of Hydromatics at $6.00 a share, payable $60,000 in cash, $60,000 in the form of a credit against pre-paid rent, and $20,000 in cash upon a claim for repair to the concrete floor of the plant building. It was also understood that an adjustment of a claim for real estate taxes and the company's participation in an increase in taxes under the lease would be effected. The stock purchase was to be for investment, with the understanding that the stock would be registered under the Securities and Exchange Act of 1933 [sic] within 18 months from the date of the consummation of the deal. An option to compel the company to repurchase the stock at $10 was also discussed, and Mr. Moss explained that the price offered seemed to be in line with the company's experience in connection with its attempted private placement of notes or debentures which up to this point had been unsuccessful. Visceglia allegedly rejected the suggested purchase of Hydromatics' stock, but offered to lend the corporation $120,000 upon terms which included its issue of 17,144 warrants to purchase its stock at $6 per share. The Board directed the officers to draft a form of contract, but reminded them that other sources of funds should be expeditiously explored. The defendant directors were aware that an increase of current liabilities in relation to the decrease of current assets would amount to a violation of the working capital provisions of the note held by the Empire Trust Company.

Of the $6 shares which were purchased by the officers and directors of Hydromatics, and by Ludwig, 33,834 shares were issued by its registrar and transfer agent on December 28, 1961. On January 2, 1962, the remainder of the $6 shares, aggregating 30,700 were issued, in different respective amounts, to Brooks, as Trustee of Hydromatics Profit Sharing Trust, and to the so-called private investors, Moses, Berkowitz, State Street Capital Corp., United Guaranty Corp., Dorsky and Lichtenstein. At $6 a share, the total return to the corporation was $387,204 for the 64,534 shares.

Each of the purchasers of the $6 shares executed a written stock purchase agreement and an investment letter. These documents were prepared by counsel for the corporation, and, as printed, bore the date of December 21, 1961. Each of these documents, however, was signed on a date subsequent to that which it bore. The purchase agreement in each case stated that Hydromatics sells to the purchaser a certain number of shares of Hydromatics' stock at the stated price of $6.00 per share. Hydromatics acknowledges receipt of the purchase price, and the purchaser acknowledges the simultaneous delivery of certificates for the shares. The agreement recited that the purchaser was requiring, as a condition of the sale, that the directors of the corporation collectively purchase 25,334 shares of the $6 stock. The agreement also provided that the corporation undertook to institute and prosecute proceedings necessary to register or qualify the $6 shares for public sale and distribution within 18 months, and to bear the cost of such registration or qualification. For its

failure to register the stock before the expiration of the initial period of 18 months, an interest penalty would be imposed upon the corporation of ½ of 1% per month of the market value of the stock sold during the following 18 month period.

The so called investment letter, also prepared by counsel for the corporation, and dated December 21, 1961, was signed by each of the purchasers of the $6 shares. The letter recites that the shares were acquired in a private transaction; that the purchaser had been supplied with current material concerning the business of the corporation, and its financial statement dated August 31, 1961, for the last fiscal year, and had discussed the company's affairs with officers, directors and financial advisers who were familiar therewith. The letter further represented that the purchaser was an active investor in securities of the type being acquired, was conversant with the problems of making an investment of the kind contemplated under the circumstances involved, and that such investment was not unusual for the purchaser in the light of the nature and size of his portfolio. Each purchaser therein further represented that he was acquiring the $6 stock for investment, and with no present intention of selling or distributing the same, or any part thereof, publicly. The purchaser agreed that in no event would any future disposition by him of all or any part of the stock be made in violation of the Securities Act of 1933 as amended. The letter also stated that, in making the aforesaid representation, the purchaser did not have in mind disposing of the stock after any specified period of time, such as the holding period for capital gains federal tax treatment, or at any point when the stock may have reached a specific price level, but that he had purchased the stock for investment, and with the idea and intention of holding it indefinitely for income, and ultimate appreciation resulting from the company's growth. The purchaser also represented that he knew of no personal circumstances which would make it necessary for him to sell the shares in the then foreseeable future, and that, by reason of his familiarity with the company's affairs, he was then aware of no circumstances relating thereto which would necessitate his sale of the stock in the foreseeable future. He agreed that he would not transfer the securities without advising the company of the circumstances requiring such transfer.

Early in December 1961 Director Brooks disclosed to his friend, Ludwig, the corporation's contemplated sale of unregistered shares of its stock at $6.00 a share. Ludwig expressed interest in investing therein. Ludwig met with Moss, the President of the corporation, at its plant and was informed that, although the company had had a loss for fiscal 1961, the first quarter of fiscal 1962 showed a profit of some $16,000. Ludwig had another meeting with Moss in January, 1962; but at neither of these meetings was there any suggestion that any officer of the corporation would be required to invest in the $6 stock.

The form of the stock purchase agreement between the corporation and the private investors was negotiated between Nathan for the corporation and Ludwig for the investors. An initial draft of the agreement, prepared by Nathan, contained no penalty provision for failure of Hydromatics to qualify the $6 stock for subsequent public sale or distribution within 18 months. The draft was accordingly modified to include that provision. Ludwig, however, requested that the agreement contain an undertaking by Hydromatics to repurchase the stock in the event of its failure to register it within 18 months, and Ludwig's attorney negotiated with Nathan respecting the inclusion of such a provision. That discussion was both by telephone and in person at Nathan's office in New York City on December 27, 1961. Nathan would not agree to that provision, but counter-suggested a penalty provision of interest at the rate of ½ of 1% per month commencing with the second eighteen-month period. This proved ul-

timately satisfactory to the negotiators, and the draft of agreement was therefore printed. As printed, the document was not available for execution until some time after December 27, 1961, although it bore the date of December 21 (the date of the directors' meeting which had authorized the sale of the stock). The shares purchased by Ludwig were not issued until December 28, and he paid for them on December 29. Throughout his negotiations with Nathan there was no suggestion by Ludwig that the officers and directors of the corporation would be required to purchase any of the $6 shares as a condition of the purchase thereof by the private investors.

After he had executed his agreement to purchase the $6 shares, Ludwig disclosed the fact of his purchase to his friends, Moses and Dorsky, who thereupon inquired of Brooks whether any more of the $6 shares were available. Upon learning that more of such shares were to be had, Moses and Dorsky arranged their own appointments for inspection of the Hydromatics' plant. Moses paid for his stock on January 2, 1962, and a certificate therefor was delivered to him on January 3. Dorsky negotiated his purchase of the stock through an attorney who, as late as January 2, 1962, sought from Nathan certain warranties and assurance that Hydromatics was not in default on its note to the Empire Trust Company. Dorsky and his attorney were referred by Nathan to Mansfield, a Vice President of Empire Trust Company, but Nathan would not agree to any of the warranties which the attorney suggested. On January 2, 1962, Dorsky delivered his check to Hydromatics for $50,400 covering his purchase of 4,200 shares and an additional 4,200 shares purchased by his co-investor, Lichtenstein. Certificates for these shares were delivered to the respective purchasers on January 3, 1962. Neither Ludwig nor any representative of Hydromatics discussed Lichtenstein's investment in the $6 shares, but his participation was pursuant to his agreement with Dorsky.

During the negotiations of Brooks and Moss with Ludwig, Moss was also negotiating with Berkowitz. Both before and after Christmas, 1961, Berkowitz visited the plant of the corporation to discuss his contemplated investment in its stock; but he never expressed any desire that the officers and directors purchase any of the stock. Berkowitz executed his stock purchase agreement and signed his investment letter on or about January 1, 1962. He paid the corporation for his 3,300 shares on January 2, and a certificate for his stock was delivered to him on January 3.

During the first week in December, 1961, and again two weeks later, Moss discussed with Perri, President of American Guaranty Corporation and Treasurer of United Guaranty Corporation, the matter of investing in the $6 stock. Perri indicated to Moss that United Guaranty Corporation and State Street Capital Corporation, two small business investment corporations, and possibly another, unnamed, were interested in investing in the stock. A letter of December 20, 1961, from Perri as President of American Guaranty Corporation, to Sokol, Comptroller of Hydromatics, confirmed commitment to purchase 10,000 shares of the $6 stock to be issued 7,000 shares to State Street Capital Corporation and 3,000 shares to United Guaranty. On December 27, 1961 State Street Capital mailed its check to Hydromatics for $42,000, for 7,000 shares of the stock, and on December 29, Hydromatics wrote State Street acknowledging receipt of the check, forwarding copies of the stock purchase agreement and investment letter to be signed and returned, and advising that the transaction would be complete upon receipt by Hydromatics of those executed documents. The executed documents were returned on January 12, 1962. On December 28, 1961 United Guaranty Corporation sent its check to Hydromatics for $18,000 for 3,000 of the $6 shares, and, on the following day, Hydromatics acknowledged receipt of the check and forwarded copies of the stock purchase agreement and investment letter to United Guaranty to

be signed and returned; stating that the transaction would be complete upon receipt of the executed documents. They were mailed back January 2, 1962.

During the negotiations between Hydromatics and Ludwig, Mansfield, Vice President of Empire Trust, had several telephone conversations with Moss regarding the latter's progress in raising equity capital in lieu of furnishing security for the bank's note. On December 26, 1961 Moss told Mansfield that he and his associates would purchase between $84,000 and $90,000 worth of stock at $6 per share, and that he had an offer from a small business investment corporation, which he intended to consummate within the then next succeeding two weeks to purchase $100,000 worth of the stock. Two days later, Moss informed Mansfield that he and his associates had put up between $140,000 and $150,000 as of that date, and that he had received a substantial commitment from a small business investment company. These representations were confirmed by Sokol in his letter to Mansfield of December 29, which stated that Hydromatics had been successful in securing approximately $300,000 in equity capital, and that the transaction would be closed prior to December 31. He also advised Mansfield that the company was negotiating with other investors for additional amounts. On the same date (Friday, December 29, 1961) Hydromatics notified the American Stock Exchange that its management had been exploring means for additional financing, and that a substantial amount of equity capital was in process of being raised by private placement with a group of investors.

The stock purchase transactions between the Corporation, as Seller, and the individual defendants, as well as Ludwig, as Purchasers, were agreed to on December 28, 1961. At the time these transactions were consummated, defendants and Ludwig were aware of the results of the first quarter of fiscal year 1962 earnings of Hydromatics (in the September-November 1961 quarter). Indeed, Moss had revealed the results of the first quarter of fiscal 1962 to Ludwig at their first meeting shortly prior to December 21, 1961. The day following these transactions, December 29, 1961, the Profit Sharing Trust purchased 5,000 of the investment letter shares. The same day, the defendants caused a letter and press release to be sent to the American Stock Exchange (but not received there until 10:23 A.M. on the morning of January 2, 1962) announcing to the public for the first time the results of the first quarter. While the results of the first quarter's operations showed a profit after taxes of $16,612, these results were, as stated in defendants' December 29, 1961 press release, "a sharp sales and earnings increase". The press release pointed out that in comparison with the first quarter of fiscal 1961, sales showed an increase from $614,688 to $938,458 (an increase of over 33%) and that profits after taxes had swung from a loss of $72,534 in the first quarter of the previous year to a gain of $16,612. Hydromatics sales and earnings for the first quarter of 1962 were material facts known to the defendants, Ludwig, and to the Profit Sharing Trustee when they completed their purchases, but were not then known to the public.

Other material facts were revealed in the press release of December 29, 1961. For the first time, defendants advised the public that "a substantial amount of equity capital is being raised from a private placement with a group of investors." While the terms of the private placement were not revealed (nor indeed the management's and Ludwig's completed participation in the deal on December 28th and the Profit Sharing Trust's participation on December 29th) the raising of substantial equity capital was a fact (as was the financial "turnaround" situation) affecting the probable future of the Company which might have affected the desire of investors to buy, sell or hold the Company's securities. With 288,000 shares issued in completed transactions a further increase in the capitalization by 38,-

834 additional shares as of December 29, 1961, (about 14% of the then capitalization) and a very probable further increase of 25,700 shares for a total increase in the capitalization by about 23%, were material facts known to the management but not made known to the public.

Although the Hydromatics' directors meeting was held on December 21, 1961, the Assistant Secretary of the Corporation, the defendant Nathan, did not prepare the minutes until several weeks later. Necessarily, the names of the prospective investors and number of shares to be issued to each were not disclosed at the meeting, but were subsequently compiled in a list made up ten days or two weeks later, and then attached to the minutes of the meeting of December 21. Also the minutes do not mention the penalty clause suggested by Ludwig on December 27, 1961. Another non-disclosed fact was that although the directors knew that the company's financial picture had begun to change, no mention of that improvement was made in the minutes.

According to the minutes, the Board Meeting on December 21, 1961 was a special one attended by all five members of the board. The President and principal stockholder of the corporation reminded his co-directors that a need for additional invested capital had become apparent earlier in the year due to the increase in the extent of the inventory required in connection with the developing commercial and industrial line of valves and to take care of the future growth of the company. He reported that many different avenues of securing such permanent financing had been explored, but that the obvious solution to the problem was sale of the stock of the corporation by means of an underwriting. This method was criticized as involving serious problems by reason of losses incurred by the corporation during the last preceding fiscal year which would create an adverse effect upon the price which might be secured for a stock issue. It was then considered that financing by borrowings from banks offered a temporary but not a permanent solution; such method having been employed in obtaining the loans from Empire Trust Company. The Directors were informed that efforts to obtain an underwriting for a stock issue had been made, but without success. Because the need for liquid working capital had become critical by reason of the accrual of past due bills jeopardizing the credit standing of the company, immediate steps were required to deal with the situation. As an additional factor, Moss mentioned that "under the terms of the Empire Trust Company Agreement the term loan is in default, placing the company in serious jeopardy." That default had been the subject of numerous discussions with the bank, which had insisted that the corporation raise additional working capital to the extent of increasing net worth "by $400,000 prior to December 31, 1961." The meeting was further advised that management's attempt to interest some private investors offered a dim prospect of success, but that other potential investors, acquainted with the management and prospects of the company, had indicated a willingness to invest in its stock. Moss stated that "since they are going to acquire unregistered stock which they are to hold for investment, they have insisted that the price of the stock be made sufficiently attractive to warrant making the investment under the circumstances"; that their interest was conditioned upon a proviso that the cost of the stock be fixed at 4 "points below the market price at this time"; that, as an additional condition to their investment, the officers and directors should "indicate their good faith and confidence in the company and its future prospects by purchasing stock at the same price as said private investors in a substantial amount; and that the President personally invest at least $50,000 in such investment stock." Accordingly, Mr. Moss, recommended that the corporation enter into agreements to sell a total of $600,000 common unregistered stock of the company, to a limited num-

ber of private investors (not in excess of 15), including some small investment companies; the stock to be acquired for investment, and not for resale, and to be offered at a price per share of $4.00 below the market price of approximately $10, or at a price of $6.00 per share. "All subsequent offerings to the extent of the amount of stock authorized to be sold but not subscribed for at this time may be offered at a price determined by a discount of $4. from the approximate market price at the time of closing." The Board of Directors concurred in the President's recommendation that "management agree to purchase common stock of the company at the same price to meet the conditions imposed by private investors in an aggregate of approximately $152,004." The President further stated that it was necessary, in order to comply with the requirements of the contemplated private investors that the corporation agree that "on or before the expiration of 18 months from the date of the agreement with [them] * * *, the company prepare and file, at its own cost, such proceedings as may be necessary to cause any shares so issued for investment to be registered pursuant to the Federal Security Exchange Act of 1933 [sic] as amended, to the end that said shares issued pursuant to the recommendations to be hereinafter made shall be qualified for public sale and distribution." In conclusion Moss stated that his co-director, Brooks, had informed him that he (Brooks) had discussed the matter with a private investor, who had agreed to purchase $50,000 of investment stock at $6 a share "upon the condition that the directors, including the President, would likewise purchase said investment stock and that this investor had about three friends in New York who would also invest on a similar basis."

The Meeting accordingly resolved that:

(1) The appropriate officers be authorized to issue up to 100,000 shares of the common stock of the corporation "to be sold for private placement to a limited number of investors, at such prices as shall be obtainable for such investment stock, to be paid for in cash and upon such additional terms and conditions as may be required." The resolution recited that the stock to be offered for sale was not registered, and, because it was to be investment stock, would be exempt from registration; but that appropriate application for listing the stock on the American Stock Exchange should be made as promptly as possible.

(2) The appropriate officers of the corporation be authorized to enter into agreements with private investors (whose names and subscriptions would be subsequently furnished) for not in excess of 100,000 shares at $6 per share, and to obtain the consent of such investors that the stock so acquired would be "for investment and not for resale publicly".

(3) The corporation agreed, prior to the expiration of 18 months from the date of the stock issue, to take such proceedings as may be necessary to cause the shares sold to the investors to be registered or otherwise qualified or exempted from registration pursuant to the Securities Act of 1933 as amended; and that such agreements (with the private investors) contain such other terms, conditions and representations as were deemed necessary by the company or its counsel.

The Directors also authorized the corporation to apply to list on the American Stock Exchange, as expeditiously as possible, "such additional shares as may be sold", and the appropriate officers to issue common stock of the company to private investors "totalling not in excess of 15 in the aggregate (including those private investors referred to in the prior resolution), for the sum representing the difference between $600,000 and $387,204, the amount obtained by the private sale referred to in the foregoing resolutions, to wit, the sum of $212,796, * * * at a price of $4.00 below the approximate market price at the time of the closing of such private placement." The authority conferred by

the foregoing resolutions was expressly limited to a period of 30 days from December 21, 1961.

The subject of the sale of the $6 shares had been discussed and the price set by the directors several weeks prior to December 21, 1961, and early in the month Brooks had told Ludwig (who became one of the private investors to the extent 8,500 shares) that the corporation was interested in selling stock at $6 per share. At the directors' meeting of December 21, it was the understanding of Moss, that no private investor other than Ludwig had suggested that any director other than Moss participate in the stock purchase. Ludwig denied that he had ever required Moss or any other director to participate in the purchase prior to Ludwig's execution of his stock purchase agreement on December 28, 1961.

The evidence shows that the defendants did not themselves consider the $6 price for the investment letter shares to be arrived at on a "closed corporation" basis or by use of the "intrinsic value" of the stock, taking into account all the myriad factors relevant to such type of valuation. Their discussions at the December 21, 1961 Board of Directors meeting demonstrate that the defendants considered the price at which the investment letter shares would be issued and that they worded the resolutions adopted at that meeting in terms of a discount from the market price of Hydromatics shares then selling on the American Stock Exchange.

The giving of an investment letter as occurred in this case did not necessarily deprive stock of fair market value.

The investment representations contained in the investment letters did not prevent the purchasers from using the stock very much in the fashion of stock not subject to such contractual restrictions, and the stock certificates themselves bore no restrictive legend. The investment letter stock could be pledged to secure a loan, as defendant Brooks used it; it could be given as a gift to charity and a tax deduction taken for its value; and it might have been resold on an investment letter basis, presumably at a discount.

Under the stock purchase agreement and investment letter, each purchaser represented he was purchasing stock for investment and with no present intention of reselling it publicly.

These documents did not render the stock unmarketable, since at the same time the defendants caused the corporation to agree that it would take whatever steps were necessary to cause the stock to be registered with the Securities and Exchange Commission (or otherwise qualified or exempted from registration) to the end that the shares be qualified for public sale and distribution, no later than 18 months after the sale. Therefore, these agreements and investment letters did not change the character of the $6 shares from the shares that were daily traded on the American Stock Exchange at higher prices. All they did was limit the purchaser in his immediate right to resell his shares until such date as the corporation might choose to file a registration statement, which was not to be more than 18 months from the date of purchase.

The defendants by virtue of their ownership of a majority of the issued shares (even without counting the shares issued in these transactions), their holding of all the directorships and officerships in the corporation, and their participation in those transactions were in control of Hydromatics and therefore they could cause it to file that registration statement with the Securities and Exchange Commission long before the 18 month period had elapsed. It would not have taken substantially more than two months to secure the approval of such registration statement by the Securities and Exchange Commission during early 1962. Under the stock purchase agreements all the costs of such registration were to be borne by the corporation so that the cost of registration was not an obstacle to resale of the investment letter stock.

Consequently, the investment representations of the purchasers did not constitute so serious a deterrent to the pur-

chasers reselling the investment stock as to deprive it of market value.

These facts (including defendants' own reference to market value in the resolutions authorizing these transactions) present a fair and rational basis for viewing the investment letter shares as of no different character than the other corporate shares contemporaneously traded on the American Stock Exchange. They also explain (in answer to the Court of Appeals inquiry) why the Trial Court "started with market price" of those regularly traded shares in determining the value of the investment letter shares on the several dates the transactions in issue occurred.

Plaintiffs introduced a number of evidentiary facts of the value of the investment letter shares on the dates in issue. On December 29, 1961, defendant Brooks took the 8,500 investment letter shares he had purchased the previous day to the National Newark and Essex Bank and pledged them as collateral for a loan of $40,000. Heath, the bank officer who made the loan had been formerly a director of Hydromatics and was familiar with the Company. Heath admitted he had been a personal friend of defendant Brooks for a number of years and knew all the other defendants personally. While called as a witness by plaintiffs, he was hostile to them and at one point plaintiffs had to invoke Fed.R.Civ.P. 26(d) to impeach him with his deposition testimony regarding the value his bank had placed on Hydromatics shares pledged with it by Brooks on December 29; 1961.

When he made that loan, Heath knew the shares were not registered with the Securities and Exchange Commission and that if Brooks defaulted on the loan, the bank could not sell the stock unless a registration statement was filed with the Securities and Exchange Commission. Notwithstanding, Heath valued the shares at $10 per share on December 29, 1961, and testified in response to the Court's question about the valuation of stock collateral, that the bank normally valued such collateral conservatively. While he testified on cross examination that his $10 valuation was an estimate, it obviously could be nothing else. However, his contemporaneous opinion of value is direct evidence of the value of the investment letter shares themselves to a third party who was familiar with Hydromatics and knew that the directors could cause the corporation to register its stock at any time.

The price levels at which Hydromatics stock had sold on the American Stock Exchange previous to the transactions in issue and immediately subsequent thereto were also placed in evidence.

Hydromatics stock was first offered to the public in December, 1959 at a price of $10 per share. After thirty minutes of trading, the price rose to $18. From the time of this first public offering to December 31, 1961, shares of Hydromatics were never traded for less than $10 per share. The price range for shares of Hydromatics stock listed on the American Stock Exchange for the period of January 1, 1961 to January 16, 1962 was as follows:

| | High | Low |
|---|---|---|
| January 1–March 31, 1961 | 22⅞ | 18⅛ |
| April 1–June 30, 1961 | 24⅞ | 17½ |
| July 1–September 30, 1961 | 18⅞ | 13 |
| October 1–December 30, 1961 | 14½ | 10⅜ |
| January 1–16, 1962 | 15⅞ | 13 |

During the month of October, 1961, Hydromatics stock on the American Stock Exchange traded in a range between an average daily high of $14.375

per share (October 17) and an average daily low of $12.84 per share (October 30).

During November, 1961, the stock traded in a range between an average daily high of $14.25 per share (November 10) and an average daily low of $11.875 per share (November 28).

During December, 1961, Hydromatics stock traded in a range between an average daily high of $14.07 per share (December 29) and an average daily low of $10.43 per share (December 21).

During the first week in December, 1961, the average daily price had fluctuated between a high of $12.625 per share and a low of $11.82 per share. During the second week in December, the average daily price had fluctuated between a high of $10.82 per share and a low of $10.68 per share. During the third week in December, the average daily range had fluctuated between a high of $10.82 per share and a low of $10.43 per share. During the last week of December, 1961, the stock traded in an average daily price range between a high of $14.07 per share on December 29, 1961 and a low of $11.43 per share on December 26, 1961. On December 27 and December 28, 1961, the average daily price was $12.93 per share and $13.25 per share respectively. The stock was not traded on either the Monday of Christmas or New Year's Day. On January 2, 1962, the average daily price was $15.50 per share.

On one day during the week, December 21, the date defendants claimed all the investment shares were sold, Hydromatics stock traded at $10.375 per share, the lowest price at which it had ever traded during 1961.

From January 3, 1962 to February 28, 1962 (except from January 17, 1962 to February 5, 1962 when the stock was suspended from trading) the range of the average daily prices on the American Stock Exchange was a high of $15.82 per share (January 17) and a low of $11.50 per share (February 28).

Thus, on a historical and contemporary basis, the value of Hydromatics shares trading on the American Stock Exchange had been substantially above the $6. price received by the corporation.

The expert testimony set forth a wide range of permissive discount which, under the facts here, is neither very helpful nor highly persuasive. However, plaintiffs introduced expert testimony regarding not only the range of permissive discounts for investment letter shares generally, but also the specific value of Hydromatics shares subject to the investment letters and purchase agreements entered into by the corporation, taking into consideration the financial condition and earnings of Hydromatics, the price action of its stock, and related matters. Plaintiffs' expert witness, Parsons, a former bank officer who had been involved in purchases of investment letter shares, testified that, considering all these factors, based upon his experience, a discount of 22% from market price on the day each transaction was entered into was reasonable.

Under § 5 of the Securities Act of 1933, as amended (15 U.S.C.A. § 77e) every purchase and sale or offer to purchase or sell any shares of any security by any person at any time is illegal unless a registration statement is currently in effect covering that sale. As Mr. Loss puts it:

"On its face, § 5 is all embracing. It applies to 'any person' and 'any security'. It thus prohibits John Jones from using the mails to sell five shares of General Motors directly to his friend, Sam Smith, unless Jones gets General Motors to file a registration statement * * *". I Loss, Securities Regulation (2d ed. 1961) p. 182.

Mr. Loss goes on to explain:

"The reason such a transaction is not prohibited is that § 4(1) [15 U.S.C.A. 77d(1)] exempts transactions 'by any person other than an issuer, under-

writer or dealer.' These terms are defined in § 2 [15 U.S.C.A. 77b], and Jones comes within none of them." I Loss, Securities Regulation (2d ed. 1961) p. 182.

The view is entirely different, however, when the fellow trying to dispose of five shares of General Motors is "in control" of General Motors.

In such circumstances, the term "underwriter" is defined in § 2(11) (15 U.S.C.A. § 77b(11)) in such a way as to include a person who contracts with the five share owner to dispose of his stock.

"This brings so called 'secondary distributions' of outstanding securities within § 5 if the person for whose account the distribution is made is in a control relationship with the issuer of the security." I Loss, Securities Regulation (2d ed. 1961) p. 183.

Since the defendants were in control of Hydromatics, their control positions brought any broker for, or purchaser of, any of defendants' shares of Hydromatics within the prohibitions of § 5 of the Securities Act of 1933 unless some exemption could be found with respect to that resale. In short, defendants could not lawfully sell any control shares of Hydromatics which they owned, absent a registration statement or some securities act exemption.

While there are very limited exemptions which under special circumstances may permit a control stockholder to sell small numbers of shares, the exemptions are so hedged around with special provisions, that any director, officer, or controlling person who purchases his corporation's shares, whether from his corporation, from an outsider, or on the Exchange, faces impediments and uncertainties with respect to his free resale thereof which grow out of his relationship to the corporation.

In circumstances where a controlling person is also an officer or director of the corporation, and desires to resell its shares at a profit, other impediments are met to that desire such as the "short

swing profits" section of the Securities and Exchange Act of 1934.

Accordingly, contemporaneous valuations of defendants' control shares of Hydromatics are relevant and material to the valuation of the investment letter shares.

On December 27, 1961, defendant Britton pledged 36,800 shares of Hydromatics stock he then owned with Mr. Heath at the National Newark and Essex Bank. These were control shares which Britton could not sell unless a registration statement had been filed with the Securities and Exchange Commission. At the time of this pledge, Heath also knew these shares could not have been sold were the loan in default, unless a registration statement was filed with the Securities and Exchange Commission. Notwithstanding, Heath valued these shares at $10 per share. Heath's valuation on December 27th of Britton's control shares (which like Britton's investment letter shares, could not be resold unless a registration statement was in effect) is evidence of the value of his investment letter shares issued the following day.

On December 29, 1961, defendant Moss donated 700 shares of Hydromatics stock he then owned to a charitable foundation he had created. Gifts to the foundation qualified as deductible contributions for federal income tax purposes. Moss, of course, claimed a tax deduction for this gift on his 1961 federal income tax return. He claimed that these 700 shares had a value on December 29, 1961 (for the purpose of calculating his 1961 income tax deduction) of $12.12 per share.

Defendant Britton too had created a charitable foundation and gifts to that foundation as well were deductible for income tax purposes. On December 29, 1961 Britton donated 500 shares of Hydromatics stock to his foundation, took a deduction for this as a charitable contribution on his 1961 income tax return, and claimed their value on that date was 12⅛ per share, or $12.12.

Since the average market price of Hydromatics shares sold on the American Stock Exchange on December 29, 1961 was $14.07 per share, the price of $12.12 per share represented a discount of about 15% from the average market price, taken by Moss and by Britton on the fair value of their shares of control stock donated to their respective charitable foundations.

The day previously Moss and Britton had paid only $6. per share to the corporation for the same shares subject to the restrictions of their investment letters. The price of $12.12 per share Moss and Britton placed on their donated control shares, when that price was advantageous to them, is some evidence of the true value of Hydromatics shares sold subject to investment letter on a contemporaneous date.

On August 4, 1961, defendant Sokol purchased 100 shares of Hydromatics stock on the American Stock Exchange at $18.62 per share, and on September 1, 1961, at the direction of Moss and Britton as the Administrative Committee of Hydromatics Profit Sharing Trust, Brooks as Trustee, purchased 200 shares of Hydromatics stock on the American Stock Exchange at $15.12 per share.

At the time of these transactions, the defendants knew that Hydromatics had suffered a substantial loss during fiscal 1961 (ending August 31, 1961), but also expected that the results of the first quarter of fiscal 1962 (ending November 30, 1962) would show either a slight profit or a break even figure, but that on a comparative basis, the first quarter would show a sharp turnaround from the previous first quarter's figures.

Defendant Brooks had been purchasing Hydromatics shares on the American Stock Exchange for several months prior to the transactions here in issue and he was willing to pay twice the $6. price he paid to the corporation. His purchases were as follows:

| Date of Purchase | Price Per Share |
|---|---|
| October 30, 1961 | $12.50 |
| November 2, 1961 | 12.25 |
| November 30, 1961 | 11.75 |

These defendants' actions with regard to shares of Hydromatics stock they purchased other than the 64,534 investment letter shares, since such other shares of Hydromatics owned by defendants had restrictions on free transfer arising out of their status as persons in control of Hydromatics, and as directors thereof is some evidence of the value of the defendants' investment letter shares.

## CONCLUSIONS OF LAW ON COMMON LAW CAUSE OF ACTION

The defendants did not sustain their burden on the first cause of action of proving that the entire transaction was honest, fair and reasonable. No amount of reference to Hydromatics' financial difficulties can justify the defendants in failing to set forth the true facts in dealing with the attacked transactions.

The representations they inserted in the purchase contract they caused the corporation to execute, that the outsiders required each of the officers and directors to join in the purchase as a condition to the outsiders' participations, were admittedly untrue. In order to prove the honesty and fairness of their participation in the transactions, they were required to vindicate this conduct but they failed to set forth facts to explain it.

It was untrue that the outsiders fixed the $6 price, as claimed in the minutes of the directors meeting authorizing the sale, since that price was fixed by the defendants themselves several weeks prior to December 21st. Defendants never explained why such representation was consistent with $6 being a fair as well as a reasonable price at which to issue the shares.

Defendants inserted the date of December 21st in the stock purchase agreements and in the investment letters and claimed all the participants to the sale of the investment letter shares were bound on that date rather than on the several later dates when the various sales were made. At the same time, they represented to the corporation in the minutes of their directors meeting that the discount was only $4 below the market price of $10.37 on December 21st when in reality it was $7.25 below market for the transactions occurring on December 28th, $8.00 below market on December 29th, and $9.50 below market on January 2nd. They had the burden of justifying this misleading action in order to prove the transactions were honest, fair and reasonable. They failed adequately to explain why such action was necessary to aid the corporation rather than themselves and the outsiders as purchasers.

Defendants misrepresented in the corporate minutes of December 21st authorizing the stock sale that the corporation had no alternative to the sale of the investment letter stock because the corporation's financial picture had not yet turned around. At that time they knew and had so informed the outsiders that the financial situation had not only turned around but that the turnaround, to use defendants' own language, constituted a "sharp sales and earnings increase". The defendants had been expecting the turnaround ever since September.

Had the defendants released that information to the public promptly, it would have allowed the market time to take in that news and reflect it in higher prices, prior to consummation of the sales of the investment letter shares. Without regard to the effect the release of the turnaround news would have had on the market price for the stock, the false representation in the minutes that the Company's earnings had not turned around, was not consistent with an honest and fair transaction engineered by insiders nor was it consistent with $6. being a reasonable price for the investment letter shares. By affirmatively misrepresenting the existence of the turnaround in the meeting minutes and refusing to make the news public until after the transactions in issue, defendants cast doubt on the bona fides of their representation that financial difficulties made the investment letter stock sale necessary. Such conduct is not consistent with their contention that the transactions were honestly conceived, fairly entered into, and at reasonable prices.

Defendants did not sustain their burden of proving that the $6. price was honest, fair or reasonable. It could not be honest because of the defendants' failure to reveal the turnaround situation and allow the stock market time to react to it, prior to their entering into the transactions in question. There was time to make the announcement of the turnaround public because Moss advised Ludwig of it prior to December 21st. It was not reasonable in the light of the actual discounts the corporation was forced to forego—not merely 43% discount on December 21st, which the defendants claimed, but discounts ranging from 55% to 62% on the dates the transactions actually occurred.

Independently of the foregoing considerations defendants failed to demonstrate that the $6 price was fair and reasonable on the dates the transactions actually occurred. The only evidence tending to support their claims that $6 was a fair price was the testimony of defendants' expert, Gill. His testimony is bottomed on the assumption that the investment letter shares were "unmarketable" because of the investment letter restrictions. Not only was the representation unwarranted, because of defendants' power, as control persons, to cause the corporation to file a registration statement for the shares at any time, but also because the defendants themselves did not arrive at the $6 price by considering intrinsic value nor by retaining an independent expert to do it for them. Rather, in the minutes of

the directors meeting, they used the same "discount from market price approach" in fixing the $6 price which plaintiff asserted at trial was the proper method for valuing the investment letter shares. Plaintiffs, on the other hand, introduced evidence from which the reasonable discount could be derived using the same method defendants asserted they used in fixing the $6 price.

While no single item of evidence, standing by itself, is conclusive as to the value of the investment letter shares on the crucial dates, the aggregate of the various items of evidence, forms an adequate basis for a finding that the fair value of the investment letter shares on those dates was the average market price less a discount of 20%.

Among the factors previously discussed which bear upon the value of the investment letter shares and a maximum discount of 20% from market, are the following: (1) the expert testimony respecting the value of the investment letter shares themselves on the critical dates (22% of market price) based upon the financial and other relevant facts; (2) the $10. per share value contemporaneously placed upon Brooks' investment letter shares by a knowledgeable third party when Brooks pledged them with the National Newark and Essex Bank on December 29, 1961; (3) the same $10. per share valuation placed upon the control shares owned by Britton when he pledged them with the National Newark and Essex Bank on December 27, 1961; (4) the $12.12 value per share valuation Moss and Britton placed upon shares donated to their charitable foundations on December 29, 1961, when establishing tax deductions for themselves, which represented approximately at 15% discount from the average market price on that date; (5) the fact that by virtue of defendants' control of Hydromatics, they could cause it to register the investment letter shares with the Securities and Exchange Commission at any time, at the corporation's expense, under the stock purchase agreement, without having to wait the full 18 months; (6) the fact that at the time of the criticized transactions, defendants knew of the sharp sales and earnings turnaround and had revealed it to the outside purchasers, but had misrepresented its existence in the corporate minutes, and had not revealed it to the public until Hydromatics' press release of December 29th was received at the American Stock Exchange on January 2, 1962, coupled with defendants' genuine expectation that the news would increase the market price for Hydromatics stock when it became public; and (7) the fact that, notwithstanding any of the problems pointed out by the defendants, Hydromatics stock had never traded at less than 10⅜ from the time immediately after the first public offering to that of the consummation of each of the transactions in issue here.

Accordingly, I have concluded that a reasonable discount factor under all the facts and circumstances of this case was 20%.[4] The measure of damages is

4. "More specifically, the 20% discount was selected after a survey of all of the testimony relating to the amount of a proper discount from market price of registered shares. Plaintiffs' experts, Parsons (and Pell) stated that the discount could range anywhere from 2–5% to 25% (Transcript at 1390) and finally compromised at about 22½% discount (Transcript at 1391). Defendant Moss, on 29 December 1969, donated 700 shares of Hydromatic stock to a charitable foundation and valued it for tax purposes at $12.12 per share. The market price of shares on that day was $14.07. The value was thus discounted by approximately 15%. Britton donated 500 shares to his own foundation, and valued it similarly at $12.12 per share giving him the same 15% discount. The $10.00 per share valuation of the shares by Mr. Heath on December 29, when the market price was $12.95 per share evidences a discount of approximately 22.-7%. A similar valuation by Mr. Heath of defendant Brook's shares on December 29 reflects a discount of approximately 29.5% per share. Thus the average of the discounts taken by or allotted to defendants is approximately 20.3%. Even an average of all discount estimates

the difference between the total price paid at $6. per share and the total price which should have been paid at 20% discount of the average market price on the dates of the respective purchases.

## MEASURE OF DAMAGES

This measure of damages is to be applied to the respective directors both for the 30,334 investment letter shares they caused the corporation to sell to themselves and to the Profit Sharing Trust, as well as for the 34,200 investment letter shares they caused the corporation to sell to the outsiders, because the breach of their fiduciary duty to the corporation is reflected in the sales to both the insiders and the outsiders.

The actual discounts, as applied to average market prices on the respective material dates were as follows:

| Date | Average Market Price | Discount |
|---|---|---|
| 12/28/61 | 13¼ | 55% |
| 12/29/61 | 14¹⁄₁₆ | 58% |
| 1/2/62 | 15½ | 62% |

Applying the proper 20% discount to these average market prices I compute the damages which should be assessed against the defendants on these sales as follows:

| Hydromatics Sold To | Date of Sale | No. of Shares | Damages Per Share | Extension Of Damages |
|---|---|---|---|---|
| Saul Ludwig | Dec. 28/61 | 8,500 | 4.60 | $ 39,100.00 |
| Harry Moses | Jan. 2/62 | 4,000 | 6.40 | 25,600.00 |
| Robert Berkowitz | Jan. 2/62 | 3,000 | 6.40 | 19,200.00 |
| Samuel Dorsky | Jan. 2/62 | 4,200 | 6.40 | 26,880.00 |
| Seymour Lichten-stein | Jan. 2/62 | 4,200 | 6.40 | 26,880.00 |
| State Street Capital Corp. | Jan. 2/62 | 7,000 | 6.40 | 44,800.00 |
| United Guaranty Corp. | Jan. 2/62 | 3,000 | 6.40 | 19,200.00 |
| Philip B. Brooks Trustee of Hydromatics Employees Profit Sharing and Retirement Trust | Dec. 29/61 | 5,000 | 5.25 | 26,250.00 |
| Bernard L. Moss | Dec. 28/61 | 8,500 | 4.60 | 39,100.00 |
| Harrison J. Britton | Dec. 28/61 | 4,167 | 4.60 | 19,168.20 |
| Leo N. Sokol and Francine Sokol | Dec. 28/61 | 1,667 | 4.60 | 7,668.20 |
| Edward Nathan | Dec. 28/61 | 2,500 | 4.60 | 11,500.00 |
| Philip B. Brooks | Dec. 28/61 | 8,500 | 4.60 | 39,100.00 |
| | | | Total | $344,446.40 |

comes to about 21.4%. Considering that the valuations given by Heath were conservative (Transcript at 498), and further considering the facts in subheadings (5), (6) and (7) of pages 41 and 42 of this opinion, 20% represents a reasonable discount on the basis of the evidence. Mathematical preciseness is not possible. This Court has attempted to reach a probable rate based on the consensus of expert opinion, the actions of the defendants at time of the transactions complained of and the other evidence presented to the Court."

Since all the defendants as a group failed to sustain their burden of proving that the transactions were honest, fair and reasonable, they breached their fiduciary duty to the corporation. A liability to make good on loss resulting from a breach of trust participated in by more than one trustee is both joint and several so that each defendant is liable for the whole of the loss.

Because defendants have failed to sustain their burden of proving that they did not breach their trust, they are liable for interest on the damages at 6% per annum from the dates of the respective sales of the corporate stock.

## CONCLUSIONS OF LAW ON RULE 10b–5 CAUSE OF ACTION

1. The defendants' failure to disclose Hydromatics' financial turnaround in the first quarter of fiscal 1962 prior to authorizing the sale of the investment letter shares was an omission to state a material fact which it was necessary for them to reveal in order to make the other statements they made at the December 21st meeting regarding the financial plight of Hydromatics and the necessity to sell investment letter shares at $6 per share not misleading, and therefore an omission within subparagraph (2) of Rule 10b–5.

2. The defendants' statement in the minutes of the meeting of December 21, 1961 authorizing the investment letter stock sale, that the obvious solution to Hydromatics' financial problems was the sale of stock by means of an underwriting, but that this solution was unavailable because Hydromatics' financial situation had not "turned around" was an untrue statement. On December 21st, the defendants knew there had been a turnaround in the first quarter of fiscal 1962 and Moss had already disclosed it to Ludwig. It therefore was an untrue statement of a material fact within subdivision (2) of Rule 10b–5.

3. The defendants' insertion of the date of December 21, 1961 in the stock purchase agreements and investment letters as the date of the sale of the investment letter shares was false since the sales were made on December 28 and 29, 1961, and on January 2, 1962. This act was material in that it juxtaposed the sale price of $6 per share against an average market price of $10.37 per share on December 21st rather than against average market prices ranging from $13.25 to $15.50 per share on the later dates when the sales actually were made. This was a deceptive act or practice which would operate as a fraud or deceit upon any person within the contemplation of subdivision (3) of Rule 10b–5.

4. The defendants knew that the statement they inserted in the minutes of the directors' meeting of December 21, 1961 authorizing the stock sale that the outside investors required that the stock be sold at $4 beneath the market price on December 21, 1961 of approximately $10. (i. e. at $6 per share) was untrue since the defendants themselves, rather than the outsiders, had fixed the $6. price several weeks prior to December 21, 1961. This misrepresentation was material as a representation that $6 per share was the highest price which could have been obtained. It was an untrue statement of material fact under subdivision (2) of Rule 10b–5.

5. The statements the defendants inserted in the minutes of the directors' meeting of December 21, 1961 at which the investment letter stock sale was authorized, that the outside investors had conditioned their investments on the requirement that the officers and directors purchase stock which were repeated as such a condition in the stock purchase agreements they caused the corporation to execute were false. The insertion of the false representation in the minutes was a material act and the insertion of the false representation in the stock purchase agreements was a material act or practice which would operate as a fraud or deceit upon any

person within subparagraph (3) of Rule 10b–5.

■ The same considerations applicable to defendants' failure to sustain their burden of proof on the common law cause of action with respect to the fair and reasonable value of the investment letter shares are applicable to the determination of the value of investment letter shares on the Rule 10b–5 cause of action, even though on the latter cause of action, the plaintiff had the burden of proof.

■ Without regard to the other misrepresentations and failures to reveal, heretofore found, the defendants caused Hydromatics to sell its investment letter shares to themselves and to the outsiders at prices substantially below the fair value thereof on the dates of sale. These transactions constituted material acts, practices and a course of conduct which would operate as a fraud or deceit on the corporation (assuming the independent stockholders were standing in the place of the defrauded corporate entity as suggested by the Court of Appeals) in violation of subdivision (3) of Rule 10b–5.

The evidence indicates that there was use of the mails in connection with the sale of the $6 shares. Investment letters were sent to private investors and small business investment corporations. Letters in regard to the issue of stock were also sent to the National Newark and Essex Bank and the National State Bank of Newark. Accordingly, defendants used the mails in connection with the sale of the investment letter shares. The representations, omissions, acts and practices engaged in by defendants and their use of the mails, were in connection with the sale of Hydromatics investment letter stock by Hydromatics to the purchasers thereof on December 28 and 29, 1961 and January 2, 1962.

■ The damages per share found in connection with defendants' failure to sustain their burden of proof on the common law cause of action, are found in the 10b–5 cause of action since the same considerations are applicable to the damage findings.

The measure of damages to the corporation is the same as found on the common law claim, as is defendants' joint and several liability and their liability for interest from the respective dates of the sales.

## SHORT SWING PROFITS § 16(b) OF SECURITIES AND EXCHANGE ACT

■ The Court of Appeals directed the District Court to decide whether defendants Moss and Britton carried the burden of proving that their aliquot portions of the short swing profits made by Hydromatics Profit Sharing and Retirement Trust did not fall within Section 16(b) of the Securities and Exchange Act because the Trust was exempted under Rule 16a–8 (g) (3), 17 C.F.R. 230 16a–8(g) (3) promulgated by the Securities and Exchange Commission. It directed that this would be an issue for the District Court to resolve if other matters were decided in a way which required the Court to reach it. However, this Court does not reach that question. Since damages are only recoverable once for a transaction involving two violations of law, there will be no recovery by the corporation under § 16(b) because defendants Moss and Britton were held liable under both the 10(b) (5) and the common law counts and damages computed thereunder will be larger than damages computed under 16(b).

This Opinion shall constitute this Court's findings of fact and conclusions of law upon remand by the Court of Appeals.

An Order for Judgment in conformity with the findings and conclusions herein expressed may be presented.